[Civ. No. 30778. First Dist., Div. Two. Apr. 26, 1974.]

JOHN V. SLATER, Plaintiff and Appellant, v.
MOYLAN KEHOE et al., Defendants and Respondents.

## COUNSEL

Hersh, Hadfield, Jorgensen & Fried, LeRoy Hersh and Nancy Hersh for Plaintiff and Appellant.

Robert E. Cartwright, Edward I. Pollock, Marvin E. Lewis, William H. Lally, Joseph W. Cotchett, Herbert Hafif, David Daar and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

McNamara, Lewis & Craddick, Marrs A. Craddick, Richard G. Logan, Crosby, Heafey, Roach & May and Herbert I. Pierce III for Defendants and Respondents.

## OPINION

**TAYLOR, P. J.**—Plaintiff, John V. Slater, appeals from an adverse judgment entered on a defense verdict in his malpractice action against the attending physician, defendant M. B. Kehoe, and Herrick Memorial Hospital, and from the order denying his motion for a judgment notwithstanding the verdict. He contends that the trial court erred to his prejudice by: 1) not instructing the jury that there was no informed consent as a matter of law; 2) rejecting his proffered instruction on the applicability of res ipsa loquitur as a matter of law and then giving an erroneous instruction on the subject; 3) failing to direct a verdict in his favor as Kehoe was negligent as a matter of law; and 4) permitting the prejudicial misconduct of Kehoe's counsel. We have concluded that there is no merit to any of these contentions and that the judgment in favor of Kehoe and Herrick must be affirmed.

Viewing the record most strongly in favor of the judgment as we must, the facts are as follows: In July 1964 after Slater suffered a coronary occlusion, he was hospitalized at Alta Bates in Berkeley and first came under the regular care of Dr. Kenneth S. Dod, an internist. Although Slater made a good recovery, Dod suggested that he see Dr. John N. K. Langton, a psychiatrist, as Dod thought that ". . . a little psychiatric attention would be of help to him as well as to strengthen the[ir] marriage." Dod described Slater as a tense, hard-driving, emotionally unstable person. Slater, a university professor of public health at that time, was directing projects for the Atomic Energy Commission and the Space Agency that required top secret "Q" clearance.

In October of 1964, Slater complained of pain in his left arm and shoulder and experienced some limitations of movement. The problem cleared up after a few months. However, in September 1965, Slater had pain in both shoulders that was diagnosed subsequently as caused by bursitis. Dod

saw Slater in October and November and then thought that Slater might have tendonitis. In November and December, Slater received physiotherapy for the shoulder condition. Treatment with steroids was discontinued as Slater had previously had a duodenal ulcer and could not tolerate the medication. Slater's shoulder condition improved until it was again aggravated when he held his grandchild. Dod then referred Slater to Dr. Kehoe, a board certified orthopedic surgeon.

Kehoe first saw Slater on December 24, 1965, when he diagnosed his condition as adhesive capsulitis, an inflammatory disease of the joint that causes the formation of scar tissue (adhesions) within the joint capsule. The capsule affected here encloses the head of the humerus (the long bone of the upper arm) and part of the shoulder blade. Adhesive capsulitis is quite painful as motion of the arm stretches the inflamed capsule. Kehoe ordered changes in the physiotherapy and next saw Slater on January 7, 1966. At that time, Slater felt that he was improving, but Kehoe found no significant change in the range of motion of the shoulder joint. When Kehoe again saw Slater on January 18, the shoulder had not improved; Slater had difficulty in handling the pain and insisted that something be done. As the result, Kehoe suggested hospitalization for shoulder manipulation.

Kehoe could not remember precisely what he told Slater about the manipulation procedure as the trial took place about five years after the event. However, Kehoe indicated that he would have told him what he would tell any patient: an explanation of the procedure of manipulation[1] and its two major risks, dislocation of the shoulder and fracture of the humerus. It is undisputed that Kehoe did not inform Slater of the additional but rare risk of brachial plexus stretch,[2] the injury that subsequently occurred.

Slater was admitted to Herrick on January 19 for manipulation of both shoulders. His right arm and shoulder were manipulated under general anaesthesia by Kehoe on January 20. After the manipulation, Slater was removed to the recovery room, where his right arm was tied to the bed above his head to prevent reformation of the adhesions inside the capsule. After Slater regained consciousness, he complained of severe pain in his

---

[1]A shoulder manipulation is performed under general anaesthesia. The physician moves the patient's arm and shoulder through a normal range of motion, thereby breaking adhesions in the capsule of the shoulder joint. The purpose of the procedure is to restore the normal range of motion to the shoulder.

[2]The brachial plexus is the system of nerves which runs from the base of the neck down the arm and controls sensation and movement in the arm.

right shoulder. At the trial, he testified that his right arm was completely paralyzed when he came out of the anaesthesia.[3]

Although Kehoe had ordered pain medication, Slater continued to complain of pain and became very apprehensive. After Slater complained of paralysis, Kehoe ordered an electromyogram for January 27 to test the nerve function of the right arm and shoulder. An electromyogram is of limited value in determining whether there is nerve injury if performed within 18 to 21 days following the trauma, but is of diagnostic value in eliminating preexisting neurological disease which might give abnormal electromyographic readings.[4]

Kehoe was away on vacation from January 26 to February 2; in his absence, Dod and his associate, Dr. Harold Mankin, attended Slater, who exhibited little change in his condition. On February 3, at Dod's request, Slater was examined by Dr. Irving Betts, a neurosurgeon, who found that Slater had good sensation in his arm but that his reaction was "a little bizarre" as he complained of extreme pain at any touching of the forearm or shoulder. Betts concluded that Slater was voluntarily holding back movement of the arm and that his pain responses seemed "almost more than the stimulus would justify." He felt that there was a distinct functional overlay (psychosomatic component) as far as motor power of the arm was concerned. He did not, however, rule out the possibility of a mild brachial plexus stretch.

The doctors at Herrick did not believe that there was complete paralysis of the arm as Slater had been able to move his right arm within the first four days of physiotherapy after the operation. Kehoe testified that he believed that there was a psychosomatic component to Slater's complaints for the following reasons: 1) he complained of anaesthesia to a certain level of his arm; this "glove" or "stocking" anaesthesia is characteristic of hysteria because the areas of anaesthesia complained of do not correspond to the distribution of nerves that activate them; 2) Slater had contradictory complaints of anaesthesia (lack of sensation) and severe pain in the same part of his anatomy at the same time; 3) the straight posture of his hand was not similar to the typical curved hand in paralysis resulting from a brachial plexus injury; and 4) in addition to narcotics, the doctors at Herrick had administered placebos to him with mixed results.

At his own request, Slater was transferred to Palo Alto-Stanford Hospital Center on February 18 for investigation as to whether there was any

---

[3]Kehoe indicated that Slater first complained of paralysis four days later.

[4]A second electromyogram was scheduled two weeks later (Feb. 10) but was not performed due to Slater's intervening transfer to Stanford Hospital.

damage to the nerves of his right arm, for physiotherapy and for supportive care. Prior to his admission to the psychiatric inpatient service at Stanford, Slater was interviewed by Dr. Charles Comfort, a staff psychiatrist. Comfort found plaintiff to be in acute depression and in an extremely regressed state. Comfort believed that depression to be of recent origin: Slater suffered from regressive depression and iatrogenic (medically induced) complications secondary to the treatment of bursitis. Comfort did not believe that Slater suffered from hysterical paralysis because . he showed a loss of electromyographic potential, which does not occur where there is hysterical paralysis.

Subsequently, Slater was examined by Dr. Leslie W. Knott, a physical medicine and rehabilitation specialist at Stanford. He was subjected to tests, including another electromyogram, and was examined by Dr. James C. White, a neurologist. White's impression was of a brachial plexus stretch injury with loss of root function C-5-6 to T-1, "a complete brachial plexus problem." Knott concurred with those findings, and found that Slater's condition suggested "a lesion involving the entire brachial plexus at the root level."

Slater was discharged from Stanford Hospital on March 10 and continued to undergo physical therapy. In April, he suffered a shoulder separation that healed with the aid of a brace. Another electromyogram performed in April indicated that some nerve regeneration was beginning in the upper arm. When Knott last examined Slater in June 1970, the right shoulder and upper arm strength had improved, but the right hand remained weak and practically useless with only a slight movement of the index finger and thumb. Muscle testing revealed 100 percent strength in the shoulder, 10 to 25 percent loss in the elbow, and 50 percent loss in the wrist.

Slater first contends that there was. an absence of informed consent, and the trial court should have so found as a matter of law. The instant trial predated the recent decision of our Supreme Court in *Cobbs* v. *Grant,* 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1] that authoritatively set forth the requirements for informed consent, at page 243: ". . . as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." As to the standard to be applied in determining reasonableness of disclosure, the court also held that: "A patient should be denied the opportunity to weigh the risks only where it is evident he cannot evaluate the data, as for example, where there is an emergency

or the patient is a child or incompetent. . . . In all cases other than the foregoing, the decision whether or not to undertake treatment is vested in the party most directly affected: the patient." In addition, the court stated at page 246 that "A disclosure need not be made beyond that required within the medical community when a doctor can prove by a preponderance of the evidence he relied upon facts which would demonstrate to a reasonable man the disclosure would have so seriously upset the patient that the patient would not have been able to dispassionately weigh the risks of refusing to undergo the recommended treatment."

Here, Kehoe does not dispute that he did not warn Slater of the possibility of a brachial stretch injury; he admitted that he only explained the manipulation procedure and the condition of adhesive capsulitis which the procedure was intended to correct. Because of the five-year lapse of time between the occurrence and the injury, Kehoe could not remember if he offered any alternatives, such as continued physical therapy.[5] In any event, there was ample substantial evidence that the injury sustained by Slater was an uncommon or remote risk of the procedure. A mild brachial stretch injury, which produces temporary tingling or numbness in the arm, occurs in approximately 5 percent of the cases; a severe stretch more seldom.

▉ As a brachial plexus stretch injury was an inherent risk of the procedure followed, we must determine whether the instruction given[6] sufficiently apprised the jury of the relevant facts to be considered.[7] In

---

[5]"Now, when you talked to Dr. Slater on the 18th of January concerning his hospitalization, did you offer any alternatives to him at that time? A. I don't recall. I made that recommendation. Certainly, the alternative was and had been available to continue in physical therapy. I didn't say that he couldn't do this. I don't recall that I recommended—I'm sure I didn't recommend that he do it."

[6]"A physician and surgeon has the duty to disclose to the patient those facts concerning the nature of the procedure which will allow the patient to form the basis of an intelligent and informed consent. In making disclosures to the patient, the physician and surgeon may consider the physical, mental and emotional condition of the patient existing at the time of the disclosure.

"If you find that Dr. Kehoe failed to disclose to Dr. Slater all the facts necessary for Dr. Slater to form the basis of an intelligent consent to the shoulder manipulation, then Dr. Kehoe is liable for all injury sustained by Dr. Slater in the shoulder manipulation, whether the result of negligence or not."

[7]Plaintiff's proposed instruction No. 37 was similar to that given. "A physician has a duty to disclose to the patient all the facts which mutually affect his rights and interests and of the risks, hazards and dangers, if any, in the procedure to be performed upon the patient.

"A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed procedure or treatment.

"Likewise, the physician may not minimize the known dangers of a procedure or treatment in order to induce his patient's consent."

*Cobbs* v. *Grant, supra,* our Supreme Court set forth two qualifications as to the requirement of full disclosure: first, the patient need not be treated with "a lengthy polysyllabic discourse on all possible complications"; and second, "there is no physician's duty to discuss the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence," (p. 244) as for example the "risks inherent in the simple process of taking a common blood sample. . ." (fn. 2 at p. 244). "However, when there is a more complicated procedure, as the surgery in the case before us [removal of a duodenal ulcer], the jury should be instructed that when a given procedure inherently involves a known risk of death or serious bodily harm, a medical doctor has a duty to disclose to his patient the potential of death or serious harm, and to explain in lay terms the complications that might possibly occur" (p. 244). We conclude that the instruction given here, although certainly not a model of detail and completeness, sufficiently apprised the jury of the relevant standard, which places primary emphasis on the "intelligent choice" of the patient and was sufficient under the facts of this case. We note that while there has been no reported California case since *Cobbs* v. *Grant,* cases in other jurisdictions that apply the reasonably foreseeable risk disclosure rule are in accord (*Mason* v. *Ellsworth* (1970) 3 Wn. App. 298 [474 P.2d 909]; *Collins* v. *Itoh* (1972) 160 Mont. 461 [503 P.2d 36]; *Starnes* v. *Taylor* (1968) 272 N.C. 386 [158 S.E.2d 339]).

Slater further argues that the second part of the instruction relating to the patient's physical, mental and emotional condition was erroneous and could only have confused the jury to his prejudice. We do not agree. The standard enunciated in *Cobbs* requires that either the patient be a minor or incompetent, or that the physician show by a preponderance of the evidence that the patient would be unable to weigh the consequences if disclosure were made. The instruction, although again not as precise as might be desired, nevertheless sufficiently enunciates the last principle laid down in *Cobbs* indicating that the patient's state of mind is an appropriate consideration. Furthermore, in cases other than *Cobbs,* our courts have recognized that in deciding how much he should tell a patient about the risks of a contemplated procedure, a physician should weigh the patient's psychological condition against the likelihood that the risk involved would materialize (*Salgo* v. *Leland Stanford etc. Bd. Trustees,* 154 Cal.App.2d 560, 578 [317 P.2d 170]). Slater erroneously asserts that it is undisputed that his mental and emotional condition at the time of disclosure was stable. While no evidence was adduced that suggested that Slater was in any way incompetent at the time he consented to the shoulder manipulation, there

was substantial evidence that he was a tense, unstable person with a history of emotional problems.

In addition, we note that in one respect, the instruction given was more favorable to Slater than *Cobbs* requires. The Supreme Court in *Cobbs* pointed out that "There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given" (*id.* at p. 245). Here, Slater testified that he would not have consented had he known of the risk of a brachial plexus stretch. However, the court in *Cobbs,* at page 245, noted that although plaintiff may testify on this subject, based on "the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils."

█ Slater next contends that the trial court erred in refusing his proffered instruction[8] on res ispsa loquitur as a matter of law, instead of leaving the application of the doctrine to the jury as a question of fact after consideration of the facts supporting the three preconditions of the doctrine.[9]

---

[8]"From the happening of the injury involved in this case, an inference may be drawn that a proximate cause of the occurrence was some negligent conduct on the part of the defendant Dr. Kehoe.

"If you draw such inference of defendant's negligence then, unless there is contrary evidence sufficient to meet or balance it, you will find in accordance with the inference.

"In the event that the defendant produces evidence which meets or balances the inference of negligence, then you need not find in accordance with such inference of negligence.

"If, however, you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant, then you may find that a proximate cause of the occurrence was some negligent conduct on the part of the defendant Dr. Kehoe. Evidence Code, Sec. 646."

[9]"You must decide the following questions concerning the injury involved in this case:

"Is it the kind of injury which ordinarily does not occur in the absence of negligence?

"Whether the injury is one which ordinarily does not occur in the absence of negligence is to be determined from the evidence presented in this trial by physicians and surgeons called as expert witnesses.

"Was the injury caused while the plaintiff was exclusively under the care or control of the defendant Dr. Kehoe? The plaintiff is not required to identify the particular agency or instrumentality which caused the injury if he is unable to do so because of his physical condition at the time the manipulation was performed.

Before the doctrine of res ipsa may be applied as a matter of law, all of the following conditions must appear: the injury (1) is of a kind that ordinarily does not occur in the absence of someone's negligence; (2) is caused by an agency or instrumentality within the exclusive control of the defendant; and (3) is not due to any voluntary action or contribution on the part of the plaintiff (*Clemens* v. *Regents of University of California,* 8 Cal.App.3d 1, 11 [87 Cal.Rptr. 108]). However, where, as here, the evidence is conflicting or subject to different inferences as to a fact necessary for the applicability of the doctrine, the question is properly left to the jury (*Davis* v. *Memorial Hospital,* 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561]). As stated in *Seneris* v. *Haas,* 45 Cal.2d 811, at page 827 [291 P.2d 915, 53 A.L.R.2d 124]: "The existence of the conditions upon which the operation of the doctrine is to be predicated is a question of fact and the right of the jury to find those facts must be carefully preserved."

In *Milias* v. *Wheeler Hospital,* 109 Cal.App.2d 759 [241 P.2d 684], the court set forth the applicable principle: "To be entitled to the inference the plaintiff must prove, by a preponderance of evidence, the facts that give rise to it. If such facts are uncontradicted, then, of course, the court instructs that the inference arises. But if, as here, the facts that give rise to the inference are in dispute, then, before the inference can arise, the jury, and not the court, must pass on this disputed question of fact" (p. 764). The court also noted that "There are many cases, such as the instant one, where the existence or nonexistence of the conditions giving rise to the doctrine are questions of fact which must be decided by the jury before the doctrine is applicable at all" (*id.* at p. 765). In *Salgo* v. *Leland Stanford etc. Bd. Trustees,* 154 Cal.App.2d 560 [317 P.2d 170], this court (Division One) held that it was reversible error for a trial court to give the mandatory re ipsa instruction where there was evidence which, if believed

---

"Was the injury due to any voluntary action or contribution on the part of the plaintiff which was the responsible cause of his injury?

"If, and only if, you find that the plaintiff's injury was of a kind which ordinarily does not occur in the absence of negligence; that it was caused while the plaintiff was exclusively under the care or control of defendant Dr. Kehoe; and that it was not due to any voluntary action or contribution by the plaintiff which was the responsible cause of his injury, you are instructed as follows: BAJI No. 6.35.

"From the happening of the injury involved in this case you may draw an inference that a proximate cause of the occurrence was some negligent conduct on the part of the defendant Dr. Kehoe.

"However, you shall not find that a proximate cause of the occurrence was some negligent conduct on the part of the defendant unless you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant. BAJI No. 4.02 (1970 Revision)"

by the jury, would have negated one of the necessary preconditions to the applicability of res ipsa.

Neither Kehoe nor the hospital seriously dispute that the second and third requisite conditions of res ipsa loquitur were present here, as Slater was unconscious during the entire shoulder manipulation. However, two defense experts negated Slater's claim that the mere occurrence of his injury implied negligence as the most probable cause.

Dr. Bret Smart testified that in his opinion, Slater had developed some type of neuritis of the nerve following the manipulation, and it might possibly have been due to a stretching of the brachial plexus. Smart also testified that risks of a properly performed shoulder manipulation include fracture of the humerus, dislocation of the shoulder, neuritis or irritation of the nerve, stretching or hemorrhage of the nerve from extraneous forces; these injuries to the nerves are uncommon but can occur. Smart indicated that the occurrence of one of the complications he described does not suggest that the procedure was performed improperly.

Slater relies on the portion of Smart's testimony indicating that, assuming the injuries described by Dr. Knott, the shoulder manipulation causing those injuries would not be within standard care. However, Slater fails to point out that Smart repeatedly disputed that Slater had received an injury as severe as that described by Knott. Smart based his opinion on his experience that patients who receive the complete denervation described by Knott do not have any recovery, whereas Slater had made considerable progress. Also, the only type of trauma that would result in the complete denervation of the brachial plexus described by Knott would also produce a fracture or dislocation of the shoulder, neither of which occurred here.

Dr. William Garoutte opined that injury to the brachial plexus could occur when a manipulation is performed in the manner used here by Kehoe. In his view, an injury to the brachial plexus such as that sustained by Slater could occur under ordinary circumstances. Garoutte explained that the brachial plexus is an exceedingly complicated structure, and that ". . . perhaps the most consistent thing about it is its inconsistency. It really is exceedingly variable."

Defendant Kehoe explained that the type of injury that here occurred is not a usual risk of the performance of a shoulder manipulation; however, because of the variations that occur in the brachial plexus, it is the type of result that can occur when due care is exercised.

The mere fact that such an injury rarely occurs does not justify an inference of negligence (*Siverson* v. *Weber*, 57 Cal.2d 834 [22 Cal.Rptr.

337, 372 P.2d 97]). "To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible" (*id.* at p. 839). Accord, *Quintal* v. *Laurel Grove Hospital,* 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161]; *Clemens* v. *Regents of University of California,* 8 Cal.App.3d 1 [87 Cal.Rptr. 108]. We conclude that the application of the doctrine was properly a question of fact for the jury.

█ Slater's amici curiae contend for the first time on appeal that the form of the res ipsa instruction given by the trial court was erroneous because it was based upon a determination that there was evidence sufficient, if believed, to rebut the presumption of negligence arising from the application of res ipsa.

Preliminarily, we note that the amici curiae are foreclosed from this contention by the doctrine of invited error. Slater's proposed Instruction No. 39[10] embodies the precise matters amici now assert are erroneous. This instruction informs the jury that an inference "may be drawn" from the happening of the injury in this case, and then instructs the jury how to handle the inference "if" the jury decides that the inference is appropriate. Slater cannnot object on appeal to an instruction or a part thereof containing the same vice as one submitted by him (*Zuckerman* v. *Underwriters at Lloyd's,* 42 Cal.2d 460, 470 [267 P.2d 777]).

█ However, even assuming, without conceding, that the issue is

---

[10]"From the happening of the injury involved in this case, an inference may be drawn that a proximate cause of the occurrence was some negligent conduct on the part of the defendant Dr. Kehoe.

"If you draw such inference of defendant's negligence then, unless there is contrary evidence sufficient to meet or balance it, you will find in accordance with the inference.

"In the event that the defendant produces evidence which meets or balances the inference of negligence, then you need not find in accordance with such inference of negligence.

"If, however, you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant, then you may find that a proximate cause of the occurrence was some negligent conduct on the part of the defendant Dr. Kehoe."

properly before us, it is clear that the contention of amici is erroneous, as they ignore the changes made in the law by the plain language of sections 646 and 604 of the Evidence Code, as well as the Law Revision Commission Comments on those sections.[11] Evidence Code section 646, subdivision (b), enacted in 1970, specifies that res ipsa loquitur is a presumption affecting the burden of producing evidence. Section 604 provides that: "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate."[12]

[11] Our research has disclosed that the amici curiae rely on a number of cases decided before the enactment of the Evidence Code in this state, and long before the enactment of section 646. As the recent enactments modified and clarified the law of presumptions and res ipsa in particular, the cases cited are of little value in construing the procedural effect of res ipsa loquitur under sections 604 and 646 (*Di Mare* v. *Cresci* (1962) 58 Cal.2d 292 [23 Cal.Rptr. 772, 373 P.2d 860]; *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498 [15 Cal.Rptr. 161, 364 P.2d 337]; *Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682 [268 P.2d 1041]; *Hardin* v. *San Jose City Lines, Inc.* (1953) 41 Cal.2d 432 [260 P.2d 63]; *Dierman* v. *Providence Hospital* (1947) 31 Cal.2d 290 [188 P.2d 12]; *Talbert* v. *Ostergaard* (1954) 129 Cal.App.2d 222 [276 P.2d 88]). Amici also rely on footnote 4 in *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], where the court noted that "After the trial in the present case, the Legislature enacted Evidence Code section 646 which codifies the doctrine of res ipsa loquitur. (Stats. 1970, ch. 69, § 1)." Section 646 was not further discussed, nor did it have any application in that case. We cannot perceive, therefore, how this passing comment supports amici's position.

[12] The Assembly Committee on the judiciary comment clarifies the meaning of this section as follows: "Section 604 describes the manner in which a presumption affecting the burden of producing evidence operates. Such a presumption is merely a preliminary assumption in the absence of contrary evidence, i.e., evidence sufficient to sustain a finding of the nonexistence of the presumed fact. If contrary evidence is introduced, the trier of fact must weigh the inferences arising from the facts that gave rise to the presumption against the contrary evidence and resolve the conflict. For example, if a party proves that a letter was mailed, the trier of fact is required to find that the letter was received in the absence of any believable contrary evidence. However, if the adverse party denies receipt, the presumption is gone from the case. The trier of fact must then weigh the denial of receipt against the inference of receipt arising from proof of mailing and decide whether or not the letter was received.

"If a presumption affecting the burden of producing evidence is relied on, *the judge must determine* whether there is evidence sufficient to sustain a finding of the nonexistence of the presumed fact. *If there is such evidence, the presumption disappears* and the judge need say nothing about it in his instructions. If there is not evidence sufficient to sustain a finding of the nonexistence of the presumed fact, the judge should instruct the jury concerning the presumption. If the basic fact from which the presumption arises is established (by the pleadings, by stipulation,

The language of the statute and the legislative history clearly show that the mere introduction of evidence sufficient to sustain a finding of the non-existence of the presumed fact causes the presumption, as a matter of law, to disappear. The legislative history also shows beyond dispute that this determination is to be made by the trial judge; if he finds there is evidence which, if believed, would rebut the presumption, he cannot give the jury the unqualified res ipsa instruction or the instruction suggested by amici curiae.[13]

■ Slater next contends that the court should have directed a verdict in his favor as Kehoe was negligent as a matter of law. This argument ignores the substantial evidence introduced by Kehoe that he was, in all respects, acting within the applicable standard of care. Kehoe's diagnosis of Slater's condition as adhesive capsulitis was confirmed by Smart's testimony. Smart also indicated that the shoulder manipulation procedure chosen by Kehoe is an accepted method of treatment of the condition. Kehoe indicated that the particular procedure he followed in Slater's case was more conservative than that followed by some doctors: the arm is not

---

by judicial notice, etc.) so that the existence of the basic fact is not a question of fact for the jury, the jury should be instructed that the presumed fact is also established. If the basic fact is a question of fact for the jury, the judge should charge the jury that, if it finds the basic fact, the jury must also find the presumed fact. Morgan, Basic Problems of Evidence 36-38 (1957)." (Italics added.)

[13]An additional explanation of the purpose and effect of section 604 is found in McDonough, *The California Evidence Code: A Précis* (1966) 18 Hastings L. J. 89. The author, then a member of the California Law Revision Commission, explains that there are two primary views concerning presumptions: 1) the Morgan view that a presumption always shifts the burden of proof; and 2) the Thayer view that a presumption disappears from the case entirely once the person against whom it operates has introduced sufficient evidence to support a finding against the presumption, without regard to whether that evidence will be believed by the trier of fact. "The Evidence Code takes the position, in effect, that the Thayer view is correct as to some presumptions, which the Evidence Code defines in section 603 as presumptions affecting the burden of producing evidence, and that the Morgan view is correct as to other presumptions, which the Evidence Code defines in section 605 as presumptions affecting the burden of proof" (*id.* at p. 99).

Further, the Law Revision Commission comment to Evidence Code section 646 (Stats. 1970, ch. 69, § 1) (29B West's Ann. Evid. Code (1966 ed.) (1974 Pocket Part) p. 58.) reads as follows: "This section provides that the doctrine of res ipsa loquitur is a presumption affecting the burden of producing evidence. Therefore, when the plaintiff has established the three conditions that give rise to the doctrine, the jury is required *to find that the accident resulted from the defendant's negligence unless the defendant comes forward with evidence that would support a contrary finding.* EVIDENCE CODE 604. If evidence is produced that would support a finding that the defendant was not negligent or that any negligence on his part was not a proximate cause of the accident, the presumptive effect of the doctrine vanishes. However, the jury may still be able to draw an inference that the accident was caused by the defendant's lack of due care from the facts that gave rise to the presumption. See EVIDENCE CODE § 604 and the Comment thereto."

rotated as that practice may result in a fracture. The operative report, corroborated by Kehoe's testimony at trial, indicated that Kehoe, while supporting Slater's shoulder, brought the right arm into "a position of abduction with considerable difficulty" and then brought the arm horizontally across the chest. In response to a hypothetical question describing the manipulation as described on the operative report, Smart opined that the manipulation was performed within the standard of care.

Kehoe and Smart repeatedly indicated that the most probable cause of Slater's injury was some anomaly within the right shoulder. Kehoe cannot be held liable for his inability to specify the particular anomaly involved, as there was testimony that the only way that one could ascertain the nature and extent of an anomaly would be to visualize it at surgery. Slater's arm and shoulder were never opened during the procedure performed here. Slater's witness Knott indicated that he knew of no anomaly except a cervical rib (which Slater did not have), which would produce the injury that occurred. The jury could, however, disregard this testimony as there was also testimony that the injury suffered by Slater was not as serious as suggested by Knott and that there are other anomalies which could cause an injury to the brachial plexus even where standard care is used. We conclude there was ample substantial evidence to support the conclusion reached by the jury that Kehoe was not negligent.

Slater finally maintains that Kehoe's counsel was guilty of prejudicial misconduct. We have considered the alleged incidents of misconduct and have concluded that they do not warrant a reversal. Although counsel's trial technique may at times have been somewhat overly zealous and faulty in resorting to impromptu statements rather than the proper form of objection, it did not interfere with the fairness of the trial or contribute to the unanimous verdict of the jury. Our courts have recognized that: "Aggressive advocacy is not only proper but desirable. Our jurisprudence is built upon a firm belief in the adversary system. Moreover, in a long trial, as this one was, vigorously prosecuted and defended, frayed tempers leading to intemperate outbursts are a to-be-expected byproduct. Skilled advocates are not always endowed with 'high boiling points.' Juries, characteristically composed of average men and women, may be assumed able to withstand substantial blandishments without surrendering their ability to reason soberly and fairly. Recognizing these factors, reviewing courts are not, and should not be, overly eager to reverse for conduct which is merely moderately captious." (*Love* v. *Wolf*, 226 Cal.App.2d 378, 393 [38 Cal.Rptr. 183].) Significantly, Slater did not refer to counsel's mis-

conduct in his motion for a new trial. We conclude that whatever error that occurred at trial was harmless beyond a reasonable doubt.

The judgment and order denying the judgment notwithstanding the verdict are affirmed.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied May 24, 1974, and appellant's petition for a hearing by the Supreme Court was denied June 19, 1974.