[Civ. No. 24543. Fourth Dist., Div. One. July 13, 1984.]

ROBERT F. HINCKLEY et al., Plaintiffs and Appellants, v.
LA MESA R. V. CENTER, INC., et al., Defendants and Respondents.

632

COUNSEL

Popko, Cornblum & McLean and Bruce Cornblum for Plaintiffs and Appellants.

Rhoades, Hollywood & Neil, Daniel Macy White, McCormick & Royce and Gene E. Royce for Defendants and Respondents.

OPINION

STANIFORTH, Acting P. J.—Robert F. Hinkley's and Dorothy Hayes' complaint for damages against La Mesa R. V. Center (La Mesa), Surveyor Industries, Inc. (Surveyor), and Chrysler Corporation (Chrysler),[1] charged

---

[1]During the course of trial, Chrysler was voluntarily dismissed from the suit.

negligence, strict liability and breach of warranty. At the end of plaintiffs' case, the trial court entered judgment of nonsuit against them in favor of La Mesa and Surveyor. The court ruled there was no credible evidence to support a recovery on any of the plaintiffs' theories. Hinckley and Hayes appeal, contending they presented sufficient evidence to support a jury verdict in their favor on all causes of action.

## FACTS

On August 4, 1976, Hinckley and Hayes purchased a 31-foot motor home from La Mesa. Chrysler had manufactured the motor home chassis on which Surveyor had built the motor home. The vehicle was covered by a five-year/50,000 mile extended warranty sold by La Mesa for which Hinckley and Hayes had paid $295, and by Surveyor's one-year/12,000 mile warranty. The total purchase price of the vehicle was $33,700.

Within one year of purchase, two separate fires occurred in the motor home's engine compartment. The first occurred in Calexico in October 1976. Hinckley had just pulled away from a stop sign when he noticed the vehicle's cockpit filling with smoke. The smoke was coming from under the dashboard and up through the steering wheel column shroud. Hinckley saw flames underneath the vehicle, next to the engine. He attempted in vain to put out the flames with a fire extinguisher; he stopped the fire only by pulling the compartment battery free and disconnecting the positive leg of the vehicle's two batteries.

Hinckley testified at the time he saw smoke in the motor home he also became aware, "We had a total loss of power; engine stopped, the whole vehicle came to a stop." Upon extinguishing the fire, the vehicle was towed to Miller's garage in Calexico where extensive rewiring of the motor home's electrical system was done.

Hinckley inspected the damage before the repairs were made. He testified regarding the damaged electrical system. The trial court admitted his testimony in light of Hinckley's background as an electrical contractor and his 21-year stint as a Navy electrician. Hinckley recounted his observation of the vehicle's main battery cable. It had been pinched against the frame creating a short which caused the fire. The engine loom (also known as the engine harness) was almost totally destroyed by fire. The Calexico mechanic cut out the burned portion of the loom, and spliced the wire to complete the circuits. He was not equipped to repair the emergency brake system, the cruise control system, or the wiring that went to the exterior lights of the motor home, all of which had been damaged in the fire.

Hinckley viewed the mechanic's rewiring work as a patchwork job. He brought the motor home back to La Mesa on November 5, 1976, for proper repair or replacement of all wiring and equipment damaged by the fire. La Mesa's agent, Mr. Fine, informed Hinckley because of the vehicle's condition it would have to be sent to Surveyor, its manufacturer, for rework. Hinckley received the vehicle back nine to ten days after leaving it at La Mesa.

By deposition (received in evidence) Fine testified he sent the motor home to Surveyor on November 5, 1976. Fine's inspection of the damage led him to believe a short occurred in the battery box when the battery box was pulled open to either inspect the battery or make some adjustments to it, then closed on the battery cable.

Surveyor, contrary to Fine's assertion, swears it made no repairs of the Hinckley-Hayes motor home, that it never received the motor home back after it was delivered to La Mesa for sale in July 1976. Surveyor's president Sheldon Baer denied responsibility for the repairs. He testified repairs would not have been performed by Surveyor because any Surveyor warranty would have been voided due to electrical modifications Hinckley had made on the vehicle.[2]

Hinckley inspected the motor home upon its return from La Mesa. The Calexico repairs were not visible; the wiring had a new configuration installed in the engine compartment. Some splicing had been made in the left side of the engine. There was excess wire on the engine's left side, entwined around the hydraulic steering hoses. The vehicle had a new loom.

At trial, Hinckley detailed the splicing of the new loom to the area that had been repaired in Calexico. *Each splice fixing the new loom to the vehicle was covered with tape. During his inspection, Hinckley did not take the tape off or apart. Hinckley testified the work appeared to have been done in a proper and workmanlike manner.* Finally, Hinckley noted the emergency brake system and the cruise control had been repaired.

After claiming the motor home from La Mesa in November 1976, Hinckley took other short, uneventful trips in the vehicle. The second fire oc-

---

[2]Hinckley admitted making various alterations in the motor home's electrical system before the first fire. These included the installation of a CB radio, and the relocation of the vehicle's AC/DC converter. He wired the radio and the converter through a fuse clip located under the dashboard. There was, however, no damage to the converter when Fine inspected it on November 5. Fine suggested: "If the converter was the reason for the battery malfunctioning, then all the wiring going from the battery to the converter would also have been burned and damaged and destroyed, and this was not the case." The addition of the CB radio has never been suggested as a cause of the first fire.

curred June 13, 1977, while Hinckley was driving the vehicle near Price, Utah. The fire again began in the left front section of the vehicle. About 5 p.m., Hinckley and Hayes received a message over their CB radio that their motor home was on fire. Hinckley noticed flames coming into the cockpit area from the left of the vehicle. The power steering and power brakes were not functioning. The emergency brake was not working. The engine, however, was still running and the vehicle "still had electricity." Hinckley smelled burning insulation and rubber. Hinckley told Hayes to jump because the vehicle was on fire. The fire was rapidly coming into the cab, and Hinckley had no control over the vehicle. Hayes jumped when the vehicle was going about 10 to 15 miles per hour. Hinckley also abandoned the vehicle 10 seconds after Hayes. Hayes sustained serious personal injuries as a result of the jump.

Before they saw the flames, neither Hinckley nor Hayes noted any unusual odors, such as that of leaking hydraulic fluid. Hinckley testified he made a practice of inspecting the vehicle daily for confused wiring, leaking oil, and leaking hydraulic fluid. A few days before the fire he had had the battery compartment inspected and the water level in the batteries checked.

The second fire totally destroyed the motor home. Its charred and twisted frame was abandoned in a Price, Utah, scrap yard.

DISCUSSION

I

STANDARD OF REVIEW

*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112 [184 Cal.Rptr. 891, 649 P.2d 224], provides the following guidelines for granting or denying a nonsuit motion: "A motion for nonsuit is a procedural device which allows a defendant to challenge the sufficiency of plaintiff's evidence to submit the case to the jury. (See generally, James & Hazard, Civil Procedure (2d ed. 1977) § 7.4, p. 236.) Because a grant of the motion serves to take a case from the jury's consideration, courts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.]

"In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, *the evidence most favorable to plaintiff must be accepted as true and conflicting*

*evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . .* [Citation.]" (*Id.* at pp. 117-118, italics added.)

"It is only when the result [of weighing all evidence in the light most favorable to the plaintiff] is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff that the granting of a motion for nonsuit is warranted." (*Van Zyl* v. *Spiegelberg* (1969) 2 Cal.App.3d 367, 372 [82 Cal.Rptr. 689].) We are required to undertake a de novo review of the grant of defendants' nonsuit motions. (*Golceff* v. *Sugarman* (1950) 36 Cal.2d 152, 153 [222 P.2d 665]; *Van Zyl* v. *Spiegelberg, supra,* 2 Cal.App.3d at p. 372.)

II

NEGLIGENCE

If we " ' 'indulg[e] every legitimate inference which may be drawn from the evidence in plaintiff[s'] favor' " (*Campbell* v. *General Motors Corp., supra,* 32 Cal.3d at p. 118), did Hinckley and Hayes present sufficient evidence to allow the jury to find defendants' repair of the motor home was in fact negligent and a proximate cause of the Utah fire? Negligence has been defined as: "[T]he doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence.

"It is the failure to use ordinary or reasonable care.

"Ordinary or reasonable care is that which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence." (BAJI No. 3.10; see also *Mosley* v. *Arden Farms Co.* (1945) 26 Cal.2d 213, 216, 217 [157 P.2d 372, 158 A.L.R. 872]; *Travelers Indem. Co.* v. *Titus* (1968) 265 Cal.App.2d 515, 519 [71 Cal.Rptr. 490].)

At trial, Robert E. Blair was called as plaintiffs' expert witness.[3] Blair testified in response to hypothetical questions as to the probable cause of

---

[3]Blair worked for the San Diego Fire Department for 34 years. He began with the department in 1942, and in 1958 was assigned to fire investigation. After two years he was promoted to captain in charge of fire investigation detail, and acted in this capacity until 1970. During the 10 years he spent as fire investigator, he investigated causes of fires in all types of buildings and vehicles. He investigated about 100 vehicle fires and several motor home fires.

the Utah fires as follows: "All right. Several probabilities as to fire cause: *The first probability that I would consider the strongest, based on the facts as outlined, would be that we had an electrical fire originating on the left front underneath portion of the vehicle.*

"The other probability that I would consider would be the possibility of a damaged high-pressure power steering hose, which would allow hydraulic fluid to leak from the system, and if the fluid came in contact with the engine manifold, a fire could have ensued.

"Considering the fact that there was no apparent leak when Mr. Hinckley examined his vehicle on the day before, it would—this probability is probably the least likely, unless something went wrong with the power steering hoses after his examination." (Italics added.)

Defendants insist Hinckley "as an expert witness testified unequivocally that the subject repairs were performed properly and that he was satisfied with the work that had been done." They further argue, "plaintiff inspected the subject repair work prior to his trip to Utah" and would therefore conclude the rewiring was performed properly and nonnegligently as a matter of law.

█ Defendants, however, are mistaken as to the import of Hinckley's testimony. They mischaracterize his testimony. Hinckley testified he inspected the repair work and was satisfied with it. He did not testify the repairs were performed properly. Hinckley in fact could not so testify *because the splicing was covered with tape; Hinckley did not remove the tape in inspecting the repair work.* Defendants fail to grasp the import of Blair's testimony as positive evidence of negligent repair by one or both defendants. Expert Blair's testimony the cause of the fire was electrical in nature was sufficient evidence to support an inference that defendants failed to use ordinary care in repairing the electrical wiring implicated in the fire. The fire started in the area where the wiring had been replaced in the course of defendants' repair. They would seek, inappositely, to weaken Blair's direct testimony by reference to certain cross-examination which started with an unsound premise, or hypothesis, and concluded with an opinion not based upon the facts in the case.[4]

---

[4]In cross-examining Blair, Surveyor's counsel (White) asked the witness to assume an incorrect fact, a fact not in evidence:

"Q: In other words, you heard [Hinckley] testify as an expert based on his background and training that the splicing was done correctly?

"A: Yes, I heard him.

"Q: *Add that fact to the hypothetical facts* that you assumed, would you then not expect the fire to be from another source other than electrical on June 13, 1977?

"A: Okay. *Adding that fact to the other assumed facts,* I would say then that I would

Blair's testimony, when viewed in its entirety, attributed the Utah fire to an electrical defect. Blair pointed to two possible causes of the fire, an electrical problem or a damaged hydraulic hose which allowed hydraulic fluid to leak onto the engine manifold. He assessed the former cause as the most likely, based on the fact an earlier electrical (fire) problem had occurred in the same vicinity as the second fire. Furthermore, neither Hinckley nor Hayes had detected an odor of leaking hydraulic fluid before the second fire. Blair suggested such odor would be highly noticeable. Hinckley had not observed leaking hydraulic fluid during his previous day's inspection of the vehicle. Blair's opinion of the electrical cause of the fire—coupled with defendants' recent repair[5] of the instrumentalities thought to be the most likely ("strongest probability") source of the second fire—constitutes more than substantial evidence of defendants' negligence as the cause of the fire. The judgment of nonsuit in favor of defendants on the negligence issue was therefore improper and must be reversed.

### III

#### RES IPSA LOQUITUR

Hinckley's theory is the foregoing evidence presents a proper case for the application of the doctrine of res ipsa loquitur and the inference of negligence arising therefrom makes, for this further reason, the granting of the nonsuit improper.

*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258], sets forth a three-pronged test for determining the applicability of the presumption of res ipsa loquitur. First, the accident which is the basis for plaintiffs' negligence claim must be of the type which does not ordinarily happen unless there is negligence. Second, the accident must be caused by an agency or instrumentality under the exclusive control of the defendant. Third, the accident must not have been due to any voluntary act

---

certainly consider the electrical still from the standpoint of having—it is rather unusual, I should say, to have two fires in the same motorhome originating in the same general area. It is unusual. So I would still consider the electrical, but yet maybe from the standpoint of not knowing just what it was exactly, or precisely.

"Q: It would not carry—

"A: I would probably find it difficult to place the electrical first, but I would certainly consider it." (Italics added.)

Thus, on the basis of an incorrect hypothetical assumption, as to the import of Hinckley's testimony, the witness, Blair, being perfectly candid, modified his previous conclusion. As has been judicially observed on numerous occasions, a defective premise yields an erroneous conclusion.

[5] For purpose of the nonsuit motion we assume, as did the trial court, Surveyor and La Mesa are equally liable for injury resulting from negligent or defective repair of the vehicle, under an agency theory. One of the two defendants repaired the vehicle.

or contributory fault of the plaintiff. (See also *Frantz* v. *San Luis Medical Clinic* (1978) 81 Cal.App.3d 34 [146 Cal.Rptr. 146]; *Slater* v. *Kehoe* (1974) 38 Cal.App.3d 819 [113 Cal.Rptr. 790].)

(1) *Was the accident of the type which ordinarily does not happen unless someone is negligent?* The trial court correctly took judicial notice of the fact relatively new motor vehicles are usually not destroyed by fire in the absence of negligence. As stated in *Gherna* v. *Ford Motor Co.* (1966) 246 Cal.App.2d 639, 647 [55 Cal.Rptr. 94]: "It is well settled that the first [*Ybarra*] condition is satisfied if there is a basis of experience, either common to the community or brought out in the evidence, from which it may reasonably be concluded that the accident is of a kind which does not ordinarily occur, unless someone has been negligent [citations]." As did the *Gherna* court which had before it claims in negligence and strict liability because of a fire of unknown origin which started in the engine compartment of an automobile, "[w]e think it is a matter of common knowledge that new [vehicles] which have been properly driven for only [a relatively few] miles do not suddenly develop a fire in the engine compartment without someone's negligence." (*Ibid.*)

The testimony of Hinckley and that of plaintiffs' expert Blair, taken together, pointed to defendants' negligence in wiring or rewiring the vehicle as the accident's cause. Blair attributed the cause of the fire to either a short in the engine's wiring, which could certainly be an affirmative indication of negligence, or to a perforation in the motor home's hydraulic hose. Taking that evidence in the light most favorable to plaintiffs, Hinckley's expert testimony eliminated the latter cause as the fire's source. Hinckley detected no odor of leaking hydraulic fluid before the second fire (Blair stated this odor would be highly apparent) and Hinckley saw no leaking hydraulic fluid on his previous day's inspection of the vehicle. Clearly, this specie of accident would not happen without negligence on the part of someone.

(2) *Was the accident caused by an agency or instrumentality under the exclusive control of the defendants?* As stated in *Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1075 [91 Cal.Rptr. 319]: "[T]he control element is satisfied if the defendant had control of the instrumentality at the time of the alleged negligent act, although not at the time of the accident *provided* the plaintiff produces evidence which is sufficient to show that the instrumentality was not mishandled or that its condition had not been changed after it left the defendant's possession. [Citations.]" Hinckley modified the electrical system by adding a CB radio and relocating the motor home's AC/DC converter. A jury could have determined, however, based

on plaintiff's evidence, that these modifications were not the cause of the fire.[6]

Plaintiffs not only established the modifications were not the result of the fire, they also showed, as *Ybarra* requires, the defendants had exclusive control when the negligent repair took place. Hinckley and Hayes did not tinker with the engine, or the vehicle's wiring, hoses, or battery, at any time after the motor home's purchase, beyond routine inspections for confused wiring, leaking oil and leaking hydraulic fluid. The manufacturer and seller of the vehicle cannot defend against liability simply on the ground plaintiffs inspected the vehicle. Hinckley testified upon his inspection of the motor home after its return from La Mesa he noted a new electrical loom had been added. All repair work done by the Ocotillo mechanic had been replaced. The fire happened after the electrical loom replacement. Thus, the jury could find defendants were solely responsible for any negligent wiring of the motor home. Thus, the second condition of *Ybarra* was satisfied, at least to the extent of presenting a question to be resolved by the jury.

(3) *Was the fire due to any voluntary act or contributory fault of the plaintiffs*? Hinckley testified modifications he made to the motor home's electrical system did not contribute to the cause of the fire. If the jury accepted Hinckley's testimony the CB radio and the electrical system run by the converter were functioning at the time of the fire, this third condition of res ipsa loquitur would be amply supported by the evidence. No other voluntary act of the plaintiffs which may have caused the accident was indicated by the evidence.

The jury under appropriate instructions should have been permitted to conclude whether the three factual conditions of the doctrine had been met. (See *Gherna* v. *Ford Motor Co.*, *supra,* 246 Cal.App.2d 639, 648-649.) Plaintiffs presented sufficient believable evidence to support the application of res ipsa loquitur, therefore, the granting of a nonsuit for this further reason was erroneous.

---

[6]Plaintiffs established the CB radio was working at the time of the Utah fire. In addition, Hinckley testified the electrical system was functioning, from which the jury could have inferred the converter was still fully operational and thus not the fire's cause. Additionally, plaintiffs affirmatively established these modifications played no part in the Calexico fire. Hinckley testified the Calexico fire did not cause any damage to the wires leading to the CB radio from the cab, where he had affixed the unit to the motor home. La Mesa employee Fine testified there was no damage to the converter itself as a result of the Calexico fire. As suggested in footnote 2, *supra,* Fine additionally noted, "If the converter was the reason for the battery malfunctioning, then all the wiring going from the battery to the converter would also have been burned and damaged and destroyed, and this was not the case." The jury could thus conclude if these modifications played no part in the first fire, they also played no part in the second fire, which started on the left front side of the motor home, the same area where the Calexico fire began.

## IV

### STRICT LIABILITY

The trial court also granted a nonsuit on the plaintiffs' strict liability claim, finding no evidence the motor home was defectively designed or manufactured or the repairs were defective. ■ Plaintiffs' evidence was sufficient to permit the jury to determine whether an unsafe or defective design and manufacture of the motor home or unsafe repair resulted in the fire and thus to allow recovery against both Surveyor and La Mesa under the strict liability doctrine. " '[I]mplicit in [a product's] presence on the market . . . [is] a representation it [will] safely do the jobs for which it was built.' [*Greenman* v. *Yuba Power Products,*] (59 Cal.2d at p. 64 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) When a product fails to satisfy such ordinary consumer expectations as to safety in its intended or reasonably forseeable operation, a manufacturer is strictly liable for resulting injuries. [Citations.] Under this standard, an injured plaintiff will frequently be able to demonstrate the defectiveness of a product by resort to circumstantial evidence, even when the accident itself precludes identification of the specific defect at fault. [Citations.]" (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].)

In *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], the damage to the car in the collision at issue precluded any direct determination of defect. The Supreme Court held plaintiffs were entitled to establish the existence of a defect in the master cylinder by expert testimony the defect was the probable cause of the collision and by circumstantial evidence a new Ford automobile which had been driven only 1500 miles went out of control, pulled to the right, and lost its steerability, "*particularly when . . . the damage to the car in the collision precluded determining whether or not the master cylinder assembly had been properly installed and adjusted before the accident.*" (61 Cal.2d at p. 260, italics added.) In *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, the fact of a fire in the engine compartment of an automobile was held sufficient circumstantial evidence from which the jury could have found a short in the wiring system resulted in the fire and consequent damage, *particularly where the fire damage precluded any direct determination of defect.* (*Id.* at p. 650.)

La Mesa and Surveyor point out *Barrett* v. *Atlas Powder Co.* (1978) 86 Cal.App.3d 560 [150 Cal.Rptr. 339], contains language to the effect a defect in manufacture or design defect must be affirmatively established, and an inference of defect solely from the fact of an accident cannot be drawn. (*Id.*

at p. 565.) We do not disagree with that dictum; we do disagree with defendants' contention plaintiffs here relied *solely* on the fact of the fire as proof of defect.

Where a product fails to such an extent that its examination can furnish no clue as to the specific part that failed, the facts (1) the accident occurred shortly after sale, (2) plaintiffs did nothing to bring about the accident, and (3) expert testimony suggests a defect in fact was responsible for the accident, allow the issue of whether defendants are strictly liable for plaintiffs' injuries to be submitted to the jury.

As Prosser, Law of Torts (4th ed. 1971) Products Liability, Proof, section 103, at page 673, notes: "The mere fact of an accident, standing alone, as where an automobile goes into the ditch, does not make out a case that the product was defective, nor does the fact that it was found in a defective condition after the event, where it appears equally likely that it was caused by the accident itself. But the addition of *other facts tending to show that the defect existed before the accident,* such as *its occurrence within a short time after sale,* or proof of the malfunction of a part for which the manufacturer alone could be responsible, may make out a sufficient case, and so may expert testimony. So likewise may . . . *elimination of other likely causes by satisfactory evidence.*" (Fns. omitted; italics added.)

*Hastings Mut. Ins. Co.* v. *Croydon Homes Corp.* (1977) 73 Mich.App. 699 [252 N.W.2d 558], involved the burning of a mobilehome allegedly the result of a faulty oil furnace with which plaintiffs had had earlier difficulties. The Michigan Court of Appeal held, despite the fact insurers' experts testified they could find no defect in the furnace and *they could not even guess as to the specific cause of the fire,* the circumstantial evidence of the fire and of past problems with the furnace presented questions of fact for the jury as to whether there was a defect in the furnace when the mobilehome in which the furnace was located was delivered. In so ruling, the court noted: "The fact that there is no evidence of a *specific* defect in a *specified* part of the furnace does not preclude submitting the issue to the jury. *We are here more dealing with allocating responsibility for damage arising from a defective product than conducting a scientific seminar as to why the product failed.*" (*Id.* at p. 562; italics added.)

Here, the complete destruction of the motor home precluded any direct determination the fire was caused by a specific defect in the electrical wiring. Expert Blair admitted at trial he could not point to specific evidence of a manufacturing or design defect in the motor home. However, the facts (1) the earlier Calexico fire began in the same locale as the Utah fire, (2) Blair testified the first and second fires were interrelated, (3) Blair consid-

ered an electrical problem the most probable cause of the fire, (4) two fires furnished circumstantial evidence from which a jury could determine an electrical defect caused the fire, and (5) trial testimony eliminated other likely causes of the fire—a leaky hydraulic hose or Hinckley's modifications to the electrical system—furnished circumstantial evidence from which a jury could determine an electrical defect, not corrected when defendants repaired the motor home, caused the fire. The trial court therefore erred in granting a nonsuit on plaintiffs' strict liability claim for unsafe or defective design or manufacture.

Here, too, Blair testified the engine wiring replaced by defendants during their repair of the vehicle was the most probable site of the fire. A jury could have alternatively determined the fire's cause was a defect in the repair, rather than in the manufacture of the motor home. The trial court improperly removed from the jury the issue of strict liability.

## V

■ Finally, plaintiffs' evidence was sufficient to warrant submission to a jury of their cause of action based on breach of warranty. To invoke the theory of breach of warranty, plaintiffs must produce sufficient evidence of product defect.

Regarding express warranty coverage, contrary to La Mesa's insistence, the five-year vehicle service contract sold by La Mesa to the plaintiffs was introduced into evidence as was the Surveyor warranty. The Utah fire occurred June 13, 1977, within the Surveyor 12-month warranty and the La Mesa 5-year warranty. Hinckley testified he had driven the motor home for less than 5,000 miles at the time of the fire, within the 12,000-mile limitation of the Surveyor warranty and the 50,000-mile limitation of the La Mesa warranty.

Contrast *Trust* v. *Arden Farms Co.* (1958) 50 Cal.2d 217 [324 P.2d 583, 81 A.L.R.2d 332], where the court held there was no evidence of a defect in the product when the product was delivered by the defendant to the plaintiff and therefore the court concluded there was no basis for claiming a breach of warranty. Here, as shown above, plaintiffs presented sufficient evidence of defect.

Sufficient substantial evidence was presented showing Hinckley's modification of the vehicle's electrical system had nothing to do with either fire. The jury therefore had competent evidence from which it could determine whether Hinckley's alterations to the system voided the express warranties

and determine whether plaintiffs were entitled to recovery under their breach of warranty theory.

## VI

For guidance of the court on any retrial, we address plaintiffs' contention of further trial court error. Plaintiffs are not persuasive in arguing the trial court abused its discretion in refusing to permit plaintiffs' counsel to introduce a two-and-one-half-foot by three-foot enlarged photograph of the burning motor home. The trial court in fact made merely a tentative ruling regarding exclusion. This tentative ruling was subject to further proof by the plaintiffs: "So, I am not saying you can't use it if your expert needs it, but your expert, first of all, will have to tell me that he can't use this other one to accomplish it, because it is a good picture. If it wasn't—and your blow up is just a copy of this one, anyway, from what you say—so tentatively I'm not going to allow it in. I will not foreclose you. Before you put it in evidence or mention it in front of the trier of fact, we'll excuse them and give you the opportunity to show why it should come in. Allright?" The trial judge stated even if he disallowed use of the enlargement he would accommodate plaintiffs' counsel by stopping the proceedings to allow the jurors to examine the smaller photograph at the appropriate time. Therefore, no real prejudice would have resulted from a final ruling of exclusion.

■ The trial court had broad discretion to exclude evidence under Evidence Code section 352. Case law has uniformly held where a photograph will not aid jurors it may be excluded. In *Moreno* v. *Hawbaker* (1958) 157 Cal.App.2d 627, 636 [321 P.2d 538], for example, a trial court's decision to exclude photographs which "did not add anything not already known to the jurors" was upheld. All that is at issue here is a photographic *enlargement*. The trial court made a determination well within its discretion the photographic enlargement would not aid the jurors but could prejudice them against the defendants.

Judgment of nonsuit on all counts is reversed; plaintiffs to receive their costs on appeal. (Cal. Rules of Court, rule 26(a).)

Wiener, J., and Work, J., concurred.