Filed 9/13/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Estate of SATISH TRIKHA Deceased. | |
| SATISH TRIKHA, JR., Appellant, v. SUCHITRA TRIKHA, Respondent. | G046800 (Super. Ct. No. 30-2010-00354963) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Mary Fingal Schulte, Judge. Reversed.

Mohammad A. Fakhreddine for Appellant.

Donna Bader for Respondent.

\* \* \*

Satish Trikha, Jr. appeals from the probate court's judgment sustaining a will contest and denying admission of the will to probate on the ground the decedent destroyed his will with the intent to revoke it.  He contends the trial court misapplied Probate Code section 6124, which creates a presumption the testator destroyed the will with intent to revoke it where the will was last in the testator's possession, the testator was competent until death, and neither the will nor a duplicate original of the will can be found after the testator's death.[1]   Satish, Jr. contends he introduced substantial contrary evidence to negate the revocation presumption, and the court erred in weighing his evidence in determining whether to apply the presumption.  We agree the court prejudicially erred and therefore reverse the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Fifty-nine-year-old Satish Trikha committed suicide in a Yorba Linda hotel room on October 27, 2009.  At the time of his death, he was married to Suchitra Trikha,[2] although she had filed a marital dissolution action the previous December and divorce proceedings were pending.  The couple had two sons, Neel and Rishi.  Suchitra filed for divorce when she learned Satish had resumed contact with his two children from a prior relationship, Sharmila and Satish, Jr. (Satish, Jr.).  The mother of these two children also had a son, Charles Arrieta.

The dispute at trial involved a will dated October 2, 2009.  The will left Satish's estate to Neel (25%), Rishi (25% in trust), Sharmila (17.5%), Satish, Jr. (17.5%), Charles (5%), and grandchildren Gio Sy (5% in trust) and Jenna (5% in trust).  Satish designated his sister Santosh as executor.

---

[1]     All statutory references are to the Probate Code unless otherwise stated.
[2]     To avoid confusion, where appropriate we will use first names of family members; no disrespect is intended.  (*Warfield v. Summerville Senior Living, Inc.* (2007) 158 Cal.App.4th 443, 445, fn. 1.)

2

Satish had possession of the original will, but no one could find it after his death. In March 2010, Satish, Jr. and Charles filed a petition to probate a copy of the will obtained from the attorney who prepared it because the original will was lost or stolen. Santosh subsequently filed a separate petition to probate the will, as did Neel and Rishi. Suchitra filed a will contest and opposed the petitions to probate the will, alleging Satish revoked the will by destroying it and his estate should pass by intestate succession. Under intestate succession, Suchitra would receive 100 percent of the couple's community property (her 50 percent and Satish's 50 percent) because they were still married when Satish died. (§ 6401, subds. (a) & (b).) She also would receive one-third of Satish's separate property. (§ 6401, subd. (c).)

As a will contestant, Suchitra had the burden of proving Satish revoked his will by destroying it. (§ 8252, subd. (a) ["contestants of the will have the burden of proof of lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation"].) Satish, Jr. however, had the initial burden of producing evidence under section 6124, which provides: "If the testator's will was last in the testator's possession, the testator was competent until death, and neither the will nor a duplicate original of the will can be found after the testator's death, it is presumed that the testator destroyed the will with intent to revoke it. This presumption is a presumption affecting the burden of producing evidence." The parties agreed the will was last in Satish's possession, he was competent until death, and neither the will nor a duplicate original of the will was found after his death. They disagreed on whether he intended to revoke the will by destroying it.

The court tried the will contest in December 2011. Satish, Jr. and Charles, as proponents of the will, offered the following evidence. Lawyer Karla Shippey testified that in early October 2009 Satish retained her to draft a will, explaining he wanted to provide for his four children. She prepared the will, including an advance health care directive and power of attorney. She later added Charles and Satish's two grandchildren

3

at Satish's request. After reviewing the will, Satish signed it in Shippey's presence on October 5, 2009, approximately three weeks before his death. Shippey advised Satish he would need to amend or make a new will after the couple finalized their divorce to account for the property settlement and change of marital status. Shippey told Satish he could revoke the will at any time and explained the difference between dying with a will and intestate. Satish took the will with him when he left her office. She advised him to keep it in a secure place, such as a safety deposit box, or place it with an executor.

Suchitra, a board certified family practice physician for over 30 years, testified she and Satish married in 1985. She discovered in 1989 or 1990 that Satish had other children, Satish, Jr. and Sharmila. Satish agreed not to have any contact with them. She filed a petition to dissolve the marriage in December 2008 when she discovered an e-mail from his daughter. To explain why she served Satish with divorce papers, Suchitra handed him a copy of Sharmila's e-mail. Suchitra explained Satish was very secretive and she had grown "tired of his lies." She disapproved of Satish sending money to an older brother, Suchil, the patriarch or "godfather" of the family. Suchil was record owner of assets she believed belonged to the marital community, including the family home in Laguna Niguel, and had failed to transfer the property to the couple.

In an e-mail to Suchil in late December 2008, Suchitra asked for his help in resolving her split with Satish. She offered to dismiss the dissolution action if Satish would agree to "total transparency," to place "ALL [their] assets" in a trust for Neel and Rishi, and to disinherit Satish's other children. Suchitra emphatically declared, "HE MUST DISINHERIT HIS OTHER CHILDREN IN WRITING as part of that trust, I cannot tolerate any monies that belong to Neel and Rishi going anywhere but to them." At trial, Suchitra explained based on Indian culture she considered Satish's other children an embarrassment or "black mark" on her family, and did not want her family or friends to learn that Satish had children from an earlier relationship.

4

In January 2009 Suchitra received an e-mail from Satish claiming "the deal" with Suchil was "done," meaning Suchil had transferred the Laguna Niguel property to them. On her part, Suchitra in subsequent e-mails tried to assure Satish she had no hidden assets, and reminded him to supply proof of the property arrangement with Suchil and to complete the trust.

According to Suchitra, Satish suffered from depression, but gave no indication he was contemplating suicide. At some point during the divorce proceedings, Satish grew violent, and Suchitra obtained a restraining order around June 2009. Suchitra last saw Satish a week before his death at a deposition in the divorce case. Before the deposition, she had not seen him since obtaining the restraining order. Suchitra claimed both she and Satish "didn't want this divorce" and were trying to reconcile.

The day after Satish's death, Suchitra retrieved some of his belongings from the coroner. She obtained his car and house keys, a laptop computer, credit cards and currency, and a bag containing divorce papers and other documents. Suchitra asserted there was no will among these documents. She also claimed she did not go through all the papers item by item; her close friends, including Anna Shaw (also known as Urmila), went through the material later.

The coroner informed Suchitra that Satish's car was at the hotel where he had been staying. She and Neel drove to the hotel, looked in the car and trunk, but Suchitra did not recall finding any documents. She called her family lawyer, who told her she could enter the Placentia residence where Satish had been living. According to the coroner investigator's case notes, Suchitra called the investigator on November 5, 2009, eight days after she had been notified of Satish's death, and seven days after she had been to the Placentia house, and stated "she thinks the decedent may have been staying at another of their residences located at [redacted]. The decedent used this residence for his work office. He worked in computer sales." It is not clear what

5

prompted Suchitra to advise the coroner of this, or why she waited so long to provide the information.

Suchitra, Neel, and Shaw entered the locked residence using the keys the coroner gave her. Suchitra did not have a separate key to the Placentia home. Satish's sister Santosh was the only other person who had a key to the residence. Suchitra saw a large box to the right of the front door labeled "To Neel and Rishi. I love you. Dad." The box and others nearby contained the children's memorabilia and photographs. She saw another computer in the kitchen, but she did not see a briefcase or any attorney business cards.

Suchitra learned about the will the following day, but did not learn it was missing until early 2010. No one told Suchitra they found or destroyed a will, and she denied finding or destroying one.

According to the coroner investigator's case notes, Satish checked into the hotel on October 25, 2009, and called the following day to extend his stay to October 28. The hotel manager found his body around noon on October 28 and immediately called 911. The coroner's notes reflected that "Legal/divorce paperwork was found," but no suicide note. The report noted the coroner initially had "[n]o leads on next of kin," but from "decedent's personal information (doctor business card)" the coroner called Suchitra and spoke to a Dr. Thompson, who immediately asked if it was a suicide. He stated the couple had been going through a nasty divorce, Satish had not been living in the house, and he had displayed erratic behavior. Suchitra phoned back and stated she had seen Satish at a deposition the previous week and they were scheduled to meet on October 29 for another one. Satish had moved out of the family home in June 2009, was currently unemployed, and previously had owned his own company. The coroner's report noted "[p]roperty has already been given to wife."

The coroner's property inventory collected at the hotel room included currency, several credit cards, a keychain with nine keys, a cell phone with case, a car

6

key, a lottery ticket, a laptop, a black bag with miscellaneous contents, and a tan leather bag with contents. Suchitra signed a receipt for the items on the morning of October 29, 2009. The coroner prepared a document containing pertinent information about Satish's death and faxed it to the Brea Police Department. The document listed Satish's relatives and included details concerning the release of the body and the property collected by the coroner. Under "suicide note data," the coroner did not check the box next to "suicide note collected" or "note testamentary."

Brea Police Officer Joe Ramirez testified hotel staff found Satish's body and called the police. Ramirez examined the hotel room and spotted "various legal documents" in a black, briefcase-type bag. He and the coroner looked through the documents, but did not find a suicide note. The coroner inventoried the papers without examining every document. They also looked in Satish's car. Ramirez testified he observed "a lot" of papers "all over the back seat" and some in the trunk, but did not notice a will.

Neel testified he went to the coroner's office with Suchitra and Shaw. The coroner gave Suchitra possession of Satish's personal belongings, including his keys, shoes, clothing, laptop, and a laptop case. They then drove to the hotel. Neel walked into the hotel lobby while his mother stayed outside, holding Satish's car keys. Neel waited about 15 minutes until a hotel employee escorted him to Satish's room. Neel entered his father's room, and a few minutes later, Suchitra and Shaw arrived and looked around the room. Neel explained he wanted to view the place where Satish passed away.

Neel left the room and walked directly to Satish's car. He opened the locked car and looked inside. There were fast food bags on the back seat, and the trunk contained a map and a sun shade. He did not find any documents in the car other than the registration in the glove compartment. Suchitra stood next to him as he searched the vehicle.

7

Neel drove Satish's Lexus to the Placentia residence. Suchitra rode with Shaw in the other car. The inside of the house was cluttered. Neel skimmed through the box with his name on it, which contained old school art and projects he and Satish had worked on. He also looked through a bag of pictures. Neel did not see a briefcase or any documents, and did not find a will. He returned to the house the following day with his brother and a friend.

Neel did not learn about the will until after Satish's funeral, and was surprised to see Satish's other children named in the will. Neel felt Satish should not have given his other children anything. At his deposition, Neel stated he "didn't know they existed." But at trial, he testified Suchitra previously informed him about Satish's children from another relationship. Neel and Satish discussed how to "get the family back together," including creating a trust [for his brother and him excluding the half-siblings], transparency, and to return funds that had been diverted. At the time of this discussion, Neel believed Satish had transferred $750,000 to his uncle Suchil.

John Schilling, Satish's divorce attorney, testified he advised Satish to prepare a new will or trust because of the dissolution proceeding. Suchitra e-mailed her lawyer in early January 2009 that Satish had agreed to place "everything" into a trust and also agreed "he disinherits his other kids." But when Suchitra's attorney sent Schilling a letter in March 2009 requesting Satish create the trust, Schilling responded in April that Satish declined. Schilling wrote to Suchitra's lawyer in June 2009 that Satish wanted to save the marriage, and on June 25th, Satish e-mailed Schilling that Suchitra now "had accepted NOT to disinherit any of the children, and now we are back to square zero on this issue." The next day, however, Satish e-mailed his lawyer that Suchitra had reversed course and again demanded he disinherit his other children. Satish described her demand as "ruthless and cold." The lawyer advised it was Satish's decision, and that "if you divorce your half of the community property is yours to do with as you please."

8

According to Schilling, Suchitra disapproved of Satish seeing his other children and had prevented him from seeing them for 15 years.

Satish e-mailed Schilling's office on October 25, 2009, after the first day of his deposition. He complained Suchitra's lawyer was "blaming my kids regarding Elachi." Schilling vaguely recalled Elachi was a business where Satish had been employing his other children, and Suchitra had been unaware of the arrangement. Suchitra's attorney accused Satish at the deposition of being dishonest and concealing the arrangement, insinuating the employment was disguised child support. Satish wrote he wanted to "indemnify them [the other children] of any wrongdoing." According to Schilling, Satish was distraught after the deposition, and believed he had been falsely accused. Satish was no longer interested in reconciliation, and was not looking forward to resumption of the deposition a few weeks later. Satish also told Schilling that Suchitra was hiding marital assets with her brother in England.

Satish never mentioned anything about a will to Schilling. Schilling and Suchitra's lawyer discussed the handling of Satish's affairs after his death. Schilling expressed his concerns about Suchitra going to the Placentia property. According to Schilling, Satish did not appear to have any separate property, although he did claim some of the property at issue belonged to others rather than the community.

Satish, Jr., who was 37 years old at trial, testified he saw his father frequently until he was about 10 years old. Later, when he was around 15 or 16, his father stopped visiting. Around 2001 or 2002, Satish telephoned out of the blue and asked him to lunch. A few months later, they got together again. Satish explained his parents (Satish, Jr.'s paternal grandparents) felt it was best for Satish to marry within his culture, and a marriage had been arranged with Suchitra. Satish, Jr. asked about the new family and if he could meet his brothers. Satish smiled and said "'maybe one day.'" Satish also told his son he had made a promise not to cross or "mix" families.

9

Around June 2009, Satish stayed with Satish, Jr. in Diamond Bar for a few days. Satish appeared stressed and frustrated and did not sleep much. Satish explained Suchitra discovered Sharmila's e-mails sent to Satish, and Suchitra accused him of cheating on her. Satish stated Suchitra "'wants everything. She wants me to disinherit you guys, and she's mean, and she's greedy.'" On the last day of the visit, they went to a restaurant for breakfast and Satish met his granddaughter, Satish, Jr.'s daughter, Jenna. Satish never introduced Satish, Jr. to any paternal relatives.

Satish's sister Santosh testified that during the divorce, Satish talked about creating a trust, and she accompanied him to an attorney's office in Irvine to discuss creating one. Satish informed the attorney he had four children and wanted to "leave his funds . . . to . . . all his children." The attorney advised him to wait until the divorce was final. Satish never told Santosh he had created a will.

Satish's 44-year-old "stepson" Charles Arrieta testified Satish "raised [him] since [he] was 4 years old." He had not lived with Satish since turning 18, and there was a long period when they had no contact. He spoke with Satish in Anaheim on June 25 about the divorce. Satish was unhappy, stated he did not want a divorce, but described his wife as "an evil, wicked woman" who "'wants me to disinherit my kids.'" Satish felt he was getting "bulldozed" by Suchitra's brother, who was a "high-powered lawyer" in England, and they were playing tricks on him. Satish complained Suchitra wanted him to disinherit the other children but Satish told Arrieta he "'would not do that.'" They spoke about Arrieta's children and Satish later visited his family to see Arrieta's newborn. After his visit, they spoke on the phone a few times. After Satish's death, Arrieta visited the Placentia property with Satish, Jr., their lawyer, and the special administrator, Eric Becker, to look for a will. A briefcase on the bar contained business cards from a trust or estate lawyer, a few pens and miscellaneous items, but was otherwise empty.

Arrieta testified he obtained documents from Satish's sister in Virginia, Sudha Goswami, shortly before he testified at trial. Arrieta recognized Satish's

handwriting on a large mailing envelope addressed to Goswami, postmarked October 6, 2009, and mailed from Atwood, California, which is a neighborhood in Placentia. The trial court sustained Suchitra's objection to Arrieta describing what documents the envelope contained.

Thirty-year-old Sharmila testified her father lived with the family when she was "really young," but she saw him only sporadically over the years. He visited mostly on weekends and called her on the phone, but stopped communicating around 1997, after he attended her wedding and walked her down the aisle. They reconnected in 2004. He explained Suchitra "told him that we were not his kids anymore" and he was not allowed to see or talk to them. She threatened to "take everything from" him and prevent him from seeing Neel and Rishi. After 2004, they spent a lot of time together, although they kept the relationship hidden because Suchitra would not approve. Satish hoped Sharmila could meet his other children, but suggested she introduce herself under an assumed name as a friend rather than a sibling.

Satish told Sharmila that Suchitra filed for divorce when she found Sharmila's e-mails to him. Sharmila encouraged her father to reconcile with Suchitra. Satish never mentioned disinheriting Sharmila, and declared it was his fatherly duty to take care of her. They met a few months before his death at a Los Angeles restaurant. He was distraught over his divorce and complained Suchitra wanted him to disinherit his older children, but he was not going to do it. He tearfully told her he loved her and that she would be fine, but he might not see her for a long time. Gravely concerned because one of Satish's brothers had committed suicide, she left messages, which Satish did not return. Finally, she left a message warning she might contact the police. Satish called her back sometime in October 2009 and asked her not to call him right now.

The trial court concluded in its nine-page statement of decision that Satish, Jr. and Charles did not "establish, by substantial evidence" it was "equally likely" the "will was lost, or that it was destroyed by someone other than the testator." The court

11

explained it "weighed the evidence and credibility of the witnesses" in reaching its decision that "it is <u>not</u> substantially likely that a person other than Satish destroyed this will. This is true even though Suchitra had motive and opportunity. The court cannot find she perjured herself when asked point blank about this will." Even if the court assumed Satish had mailed a copy of the will to his sister, it still found "the evidence is not substantial enough to rebut the presumption."

Satish, Jr. moved to vacate the judgment (Code Civ. Proc., § 663) based on insufficient evidence, and because the "Court imposed on [him] the wrong burden, and therefore reflects an incorrect or erroneous legal basis for the decision, not consistent with or not supported by the facts." At the hearing on the motion to vacate, the court stated it had reviewed its statement of decision and notwithstanding "any awkwardness," the court had not shifted the burden of proof to Satish, Jr. to prove Satish did not revoke the will, remarking "that wasn't my intent." The court acknowledged it might have overstated the fact Satish left Suchitra's business card in a "prominent place" in the hotel room because the card was apparently found in his wallet, but also stated this was not "the linchpin" of the court's decision. The court denied the motion to vacate.

II

DISCUSSION

Satish, Jr. contends he produced substantial evidence to overcome section 6124's revocation presumption, and the trial court prejudicially erred by weighing the conflicting evidence because doing so effectively placed the burden of *proof* on him to establish Suchitra destroyed or appropriated the will, or that Satish did not destroy it. Suchitra responds that Satish, Jr. did not meet his burden to produce "substantial evidence" that Satish did not destroy the will. Alternatively, she argues that even if Satish, Jr. produced enough evidence to overcome the presumption, the error was not prejudicial "because there was a preponderance of evidence to support the trial court's finding that Satish destroyed his will with the intent to revoke it." As we explain, the

12

trial court prejudicially erred in finding Satish, Jr. did not produce substantial evidence to overcome the presumption.

## A. *The Revocation Presumption*

Rebuttable presumptions affect either the burden of proof or the burden of producing evidence. (Evid. Code, § 601.) By its express terms, section 6124 falls into the latter category: "If the testator's will was last in the testator's possession, the testator was competent until death, and neither the will nor a duplicate original of the will can be found after the testator's death, it is presumed that the testator destroyed the will with intent to revoke it. *This presumption is a presumption affecting the burden of producing evidence*." (Italics added; see also Evid. Code, § 110 ["'Burden of producing evidence' means the obligation of a party to introduce evidence sufficient to avoid a ruling against him on the issue"]; Evid. Code, § 550, subd. (a) ["burden of producing evidence as to a particular fact is on the party against whom a finding on that fact would be required in the absence of further evidence"].)

Evidence Code section 603 declares that presumptions affecting the burden of producing evidence, like section 6124's revocation presumption, "implement no public policy other than to facilitate the determination of the particular action in which the presumption is applied." The Law Revision Committee's comments to section 603 explain that these presumptions are based on experience, "intended solely to eliminate the need for the trier of fact to reason from the proven or established fact to the presumed fact and to forestall argument of the existence of the presumed fact *when there is no evidence to prove the nonexistence of the presumed fact*." (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 603, p. 57, italics added.) In other words, a presumption affecting the burden of producing evidence is not evidence but merely an assumption designed solely to help the trier of fact reach a determination. (Evid. Code, § 600, subd. (a); *Haycock v. Hughes Aircraft Co*. (1994) 22 Cal.App.4th 1473, 1492.)

13

Evidence Code section 604 establishes how the presumption operates: "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate." The Law Revision Commission comment accompanying Evidence Code section 604 explains that the presumption "is merely a preliminary assumption in the absence of contrary evidence, *i.e.*, evidence sufficient to sustain a finding of the nonexistence of the presumed fact." (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 604, p. 59.) For example, under Evidence Code section 641, the trier of fact must presume a letter correctly addressed and properly mailed was received in the absence of contrary evidence. But "if the adverse party denies receipt, the presumption is gone from the case." (*Slater v. Kehoe* (1974) 38 Cal.App.3d 819, 832, fn. 12.)

Thus, the presumption exists "unless and until evidence is introduced which would support a finding of its nonexistence." (Evid. Code, § 604; *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 421; "[W]hen the party against whom such a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor it initially worked to prove the fact in question." (*Rancho Santa Fe Pharmacy, Inc. v. Seyfert* (1990) 219 Cal.App.3d 875, 882 (*Rancho Santa Fe Pharmacy*); see also *In re Heather B.* (1992) 9 Cal.App.4th 535, 561 [if contrary evidence introduced presumption has no further effect]; *Estate of Obernolte* (1979) 91 Cal.App.3d 124, 129 (*Obernolte*).)

The burden of proof is also a rebuttable presumption. (Evid. Code, § 601; see *Farr v. County of Nevada* (2010) 187 Cal.App.4th 669, 680 (*Farr*).) But the burden

14

of proof and the burden of producing evidence "remain distinct and should not be confused." (*Id.* at p. 682.) The burden of proof """"means the obligation of a party to establish a *requisite degree of belief* concerning a fact in the mind of the trier of fact or the court.""" (*Rancho Santa Fe Pharmacy, supra,* 219 Cal.App.3d at p. 880.) In contrast, "[t]he burden of producing evidence is 'the obligation of a party to introduce evidence *sufficient to avoid a ruling against him* on the issue.'" (*Ibid*.) During the course of a trial or hearing the burden of producing evidence, once met, may shift between the parties as further evidence is introduced, while the burden of proof stays with the party designated by law. (*Farr, supra*, at p. 682.) Thus, a presumption affecting the burden of producing evidence requires the trier of fact to assume the existence of the presumed fact unless contrary evidence is introduced. Once evidence negating the presumed fact is presented, the trier of fact must decide the case under the applicable burden of proof without regard to the presumption "simply by weighing the evidence." (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 826.)

B. *The Trial Court Erred in Finding No Substantial Evidence Was Produced to Negate the Revocation Presumption*

Satish, Jr. could overcome the revocation presumption by introducing substantial evidence tending to contradict the assumption his father destroyed his will with the intent to revoke it. (*Obernolte, supra*, 91 Cal.App.3d at p. 129.) Substantial evidence is defined as reasonable and credible evidence of solid value carrying legal significance. (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) It may consist of reasonable and logical inferences derived from the evidence, rather than conjecture or speculation. (*Ibid*.)

*Obernolte* is an example of substantial evidence vitiating the common law revocation presumption codified later in section 6124. There, the decedent executed an original will leaving her estate to her daughter and several other relatives. The decedent,

15

however, was unhappy with the named beneficiaries because they never visited her. (*Obernolte, supra*, 91 Cal.App.3d at p. 127.) She threatened to destroy her will several times and not replace it, evidently unaware that if she died intestate her daughter would inherit her entire estate. (*Id*. at p. 127, fn. 2.) But during the two months between the creation of the decedent's last will and her death, she expressed concern about protecting the will, and when visiting her attorney 11 days before her death, never mentioned anything about destroying her will or revising it. (*Id*. at p. 127.) Within hours of her death, the decedent's daughter searched her mother's apartment for the will, but claimed she found only an empty envelope in the cedar chest where decedent had stored the will. (*Ibid*.) The trial court found the revocation presumption had been rebutted because persons other than the decedent had access to the will and it was "'equally probable'" that someone other than the decedent destroyed the will. (*Id*. at p. 128.)

The appellate court agreed the presumption could be rebutted by evidence showing it was equally probable another person destroyed the will. (*Obernolte, supra*, 91 Cal.App.3d at p. 129.) The court explained, "[e]qual probability does not satisfy a burden of proof; it does, however, satisfy a burden of producing evidence. [Citation.] In other words, the effect of the rebuttable presumption of revocation of a will is prima facie only; it exists only until rebutted by substantial evidence." (*Ibid*.) Thus, the revocation presumption automatically disappeared when the will's proponents introduced contrary substantial evidence even though it was equally probable the testator deliberately destroyed the will.

The appellate court also concluded the decedent's expressed concern about protecting her will, and her failure to inform her attorney when she met him a few days before her death that she had destroyed her will constituted substantial evidence rebutting the presumption of revocation. The court also found it equally probable that if the will was destroyed, someone other than the decedent did so. The court pointed to the handyman who had access to the will or the decedent's daughter who stood to inherit all

16

her mother's estate without a will, but only one-sixth under the will. (*Obernolte, supra*, 91 Cal.App.3d at p. 130.)

*Estate of Moramarco* (1948) 86 Cal.App.2d 326 (*Moramarco*) also exemplifies the showing required to overcome the revocation presumption. There, the decedent left his entire estate to his two brothers who departed Italy to join him in California and together they entered into a life-long partnership in the winery business. A fourth brother remained in Italy. The trial court admitted a copy of the decedent's will into probate when the original could not be located. The children of the decedent's brother in Italy appealed, arguing the revocation presumption applied to bar admission of the copy because the decedent had possession of the original, but it could not be found after his death. (*Id*. at pp. 328-329, 333-334.)

The appellate court in *Moramarco* found the presumption was overcome because no evidence showed the decedent destroyed the will and the disposition of the property coincided with the decedent's expressed desires and statements made shortly before his death. As the court explained, "[T]he terms of the will expressed not only [the decedent's] wishes with respect to the division of his estate, but they recognized a moral, if not legal, obligation to leave to his two brothers the shares of the estate which they had earned by their labor and other contributions." (*Id*. at p. 337.)

Applying the foregoing principles, we conclude Satish, Jr. produced an abundance of substantial evidence to overcome the revocation presumption. Satish repeatedly expressed his desire to provide for his older children in his will, and complained that Suchitra's demand he must agree to disinherit them before he could reconcile with her was "cold and ruthless." Although Satish wanted to save his marriage, he could not bring himself to sever the bonds to his older children and leave them nothing in his will. Only three weeks before his death, Satish retained an attorney to draft a will that provided for all his children. The attorney drafted the document in consultation with Satish, who reviewed it before signing it in the lawyer's presence. The attorney

17

explained to Satish the difference between dying with a will and intestate. Satish therefore understood his older children would receive nothing if he died without a will, but proceeded to sign the will and take the original with him. There was no evidence Satish had second thoughts about providing for his older children, or told anyone he intended to revoke the will. (*Estate of Ronayne* (1951) 103 Cal.App.2d 852, 858 (*Ronayne*) [evidence decedent consistently adhered to her testamentary plan and her antagonism toward her spouse was sufficient to rebut inference of revocation].) Satish's execution of the will that formalized his expressed desire to provide for his older children just three weeks before his suicide constitutes substantial evidence he did not intend to revoke his will.

The evidence Satish, Jr. introduced regarding Suchitra's financial and cultural motives to seize or destroy the will also constituted substantial evidence Satish did not intend to revoke his will. (See *Obernolte, supra*, 91 Cal.App.3d at p. 130.) Suchitra considered the existence of Satish's older children an embarrassment and "black mark" on her family, and sought to keep their existence unknown to her family or friends. In an e-mail to Satish's brother, she declared categorically, "HE MUST DISINHERIT HIS OLDER CHILDREN IN WRITING" as part of a proposed trust because "I cannot tolerate any monies that belong to Neel and Rishi going anywhere but to them." If Satish died intestate, Suchitra would inherit virtually all of his large estate, but would receive only about half of the estate if his will were found.

Moreover, Suchitra had several opportunities to take the will. She received Satish's property, including "Legal/divorce paperwork" from the coroner. She had access to Satish's car at the hotel while Neel was in the hotel room. Officer Ramirez testified he spotted "a lot" of documents spread over the backseat, but Neel searched the car and found only fast food wrappers on the back seat, and the only document was the vehicle registration in the glove compartment. Suchitra, Neel, and Shaw were the first to enter Satish's Placentia residence after Satish's death. Only Satish and his sister Santosh

18

had keys to the Placentia house, a location where Satish might naturally have kept the will. (*Ronayne, supra*, 103 Cal.App.2d at p. 857 [evidence decedent's estranged spouse took possession of house before complete search for will could be made was sufficient to overcome revocation presumption].)

The foregoing evidence satisfied Satish, Jr.'s burden to produce evidence sufficient to sustain a finding Satish did not intend to revoke his will by destroying it.

C. *The Trial Court Prejudicially Erred in Weighing the Evidence*

The trial court expressly declared in its statement of decision that it "weighed the evidence and credibility of the witnesses" in finding the evidence "not substantial enough" to overcome the revocation presumption, primarily because the court believed Suchitra's claim she did not destroy the will. Thus, the court evaluated whether Satish, Jr.'s evidence *persuaded* it that Satish did not destroy his will, rather than focusing on whether his evidence constituted substantial evidence negating the revocation presumption. (See *Wollersheim v. Church of Scientology* (1999) 69 Cal.App.4th 1012, 1017 ["[t]he substantial evidence test does not ask what proposed facts are more likely than not to be the true facts"].) In essence, by weighing the evidence in this fashion, the court erroneously engaged in a burden of proof analysis in determining whether the revocation presumption applied.

As discussed above, the party with the burden of proof must establish by "evidence a *requisite degree of belief* concerning a fact in the mind of the trier of fact." (Evid. Code, § 115, italics added.) In contrast, the burden to produce evidence obligates a party to "introduce evidence sufficient to avoid a ruling against him on the issue." (Evid. Code, § 110.) Satish, Jr. introduced substantial evidence to negate the preliminary presumption of revocation. At that point, the revocation presumption disappeared and the court was required to decide the matter based on the burden of proof. Here, Suchitra had the burden of proving Satish deliberately destroyed his will. (§ 8252; Evid. Code, § 500.) In weighing Suchitra's denial she destroyed the will against substantial evidence negating

19

the revocation presumption, the trial court conflated the burden of producing evidence to overcome the revocation presumption with Suchitra's burden of proving by a preponderance of the evidence Satish revoked his will by destroying it. Put another way, when the court weighed the substantial evidence Satish, Jr. introduced, it required him to persuade the court that someone other than Satish destroyed his will. Satish, Jr. did not bear that burden.

We cannot say the trial court would have reached the same result had it not erred in applying the revocation presumption. Suchitra had the burden to prove by a preponderance of the evidence that Satish destroyed his will with the intent to revoke it, and there is scant evidence he did so. We therefore conclude it is reasonably probable Satish, Jr. would have received a more favorable result in the absence of the court's error. We therefore reverse the judgment, and remand the matter for a full retrial of the disputed factual and legal issues.

## III

### DISPOSITION

We reverse the judgment and remand for a new trial consistent with the principles discussed in this opinion. Satish, Jr. shall recover his costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

20