Filed 1/30/26  In re Mateo S. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re MATEO S., a Person Coming Under the Juvenile Court Law. | B342048 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 24CCJP03235A) |
| Plaintiff and Appellant, | |
| v. | |
| JAVIER R. et al., | |
| Defendants and Respondents; | |
| MATEO S., a Minor, | |
| Objector and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

Anuradha Khemka, under appointment by the Court of Appeal, for Objector and Respondent.

## INTRODUCTION

The juvenile court dismissed a Welfare and Institutions Code[1] section 300 petition as to minor Mateo S. The Los Angeles County Department of Children and Family Services (DCFS) appeals, contending the juvenile court erred by not finding section 355.1's rebuttable presumption applicable and "erred in supplanting its own opinions for that of the competent medical professionals."

We find the juvenile court did not err and affirm the order of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Referral and Investigation*

On October 5, 2024, DCFS received a referral alleging physical abuse of two-month-old Mateo. The night before, at 9:55 p.m., Mateo was brought to the hospital by 22-year-old Destiny S. (Mother), 24-year-old Javier R. (Father), and maternal grandmother (MGM), with a possible injury to Mateo's right arm. Dr. Sarah Richards and SCAN (Suspected Child Abuse and Neglect) specialist Dr. Andrea Kablanian examined Mateo and found "multiple, unexplained bruises"—"a bruise on the right side of his jaw line, two bruises on his upper right posterior shoulder, two bruises on his mid back, a bruise on his right hip, and a bruise on his right upper buttock, right below his diaper line." Mother said Mateo was "fussy" all day and had difficulty going to sleep. MGM, who lived nearby, agreed to watch Mateo while Mother and Father went to Target. MGM then noticed

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

Mateo did not want to be touched on his right arm; she notified Mother and Father, who immediately returned from Target and took Mateo to the emergency room.

Mateo's arm injury was diagnosed as nursemaid's elbow injury, which "occurs when the elbow ligament slips out of place and the radius bone shifts out of position"; nursemaid's elbow injury "can be a result of the child's arms being pulled. . . , which is common with toddlers being pulled from their arms; however, Mateo is too young for such an injury." It was reported that while the parents were cooperative, neither had an explanation for Mateo's injuries. Dr. Kablanian ordered a complete skeletal survey of Mateo.

A children's social worker (CSW) made an unannounced visit to the hospital. The CSW interviewed Mother. Mother stated she and Father live together and have been engaged for the last three months; Mateo is their first child. The CSW observed Mother interacting with Mateo "in an appropriate and caring manner." Mother disagreed with the referral allegations and reported she did not have a reason to believe Mateo is currently being abused or neglected by anyone. Mother denied that she or Father ever disciplined Mateo. Mother explained she thought Mateo was fussy due to the two-month vaccines he received on his thighs the prior week. She had given Mateo Tylenol.

Mother indicated Mateo's nursemaid's elbow injury could be "due to the way she holds the child, because she tends to hold him under his arm pits, with her two arms." She also explained Mateo started getting "red blemishes all around his body" when he was born, and Mateo's doctor said it could be "due to a number of factors, like the heat wave, soap, detergent, or something else."

Mother told the CSW that Mateo has "sensitive skin" and is lactose intolerant. As for the bruise on Mateo's jawline, Mother said "it is probably due to the way [F]ather burps him," using the "C-cup style, in which [F]ather makes a C shape with his hand, and then burps the child from the back." As for the bruise on Mateo's hip/buttocks, Mother said "it is probably from his diaper" and that she has tried multiple brands of diapers and was "struggling to find the right diaper brand, because they all give [him] a diaper rash." Mother showed the CSW images of notes from Mateo's pediatrician, dated August 20, 2024, where Mother asked about Mateo's red skin blemishes and was prescribed medication for his acne. The pediatrician advised Mother to change both Mateo's and the parents' detergent and soap.

The CSW next interviewed Father at the hospital. Father stated Mateo "would not stop crying" when placed on his right side and would only stop crying when he was on his back. MGM had pointed out to them that Mateo had a bump on his right arm and red lines where his arm creases. When asked about Mateo's nursemaid's injury, Father denied knowing the cause and said Mother tends to do exercises with Mateo when changing his diaper and it may have been from that. He said Mother tends to lift Mateo up "with her two fingers on each side." When asked about the bruise on Mateo's jawline, Father said it might be from the way he burps Mateo in a C-cup position. He described how he "puts [Mateo] on his knee, facing his left side, then uses one of his arms to do a C-shape, and puts it near [Mateo's] jaw to hold him up, and . . . burps [Mateo] from the back." When asked about the bruises on Mateo's buttocks/hip area, Father said he did not know how Mateo obtained those bruises; Father explained the pediatrician "asked them to change their detergent, soap, and

4

diapers." Father confirmed having tried at least three different diaper brands but haven't yet found one that works with Mateo's sensitive skin.

The CSW observed Mateo and saw "redness on his skin, on his forehead, the top of his head, on his neck, on his nose, and on both eye lids." Mother stated that Mateo was "born like that, as he was diagnosed with Stork kisses." The CSW also observed how sensitive Mateo's skin was, as Mother "touch[ed] him gently and le[ft] her fingerprints on his body for a short time period." The CSW noticed Mateo has a Mongolian birthmark in the middle of his buttocks as well as a number of other birthmarks; Mother confirmed Mateo has "at least eight birthmarks on his body" including on his nose, forehead, neck, top of the head, left hand, buttocks, right armpit, and right shoulder. The CSW observed the bruise on Mateo's right jaw and "redness on his right upper buttocks, near the diaper."

The CSW interviewed MGM, who said she had no concerns about Mother's or Father's parenting style. She denied parental physical discipline or abuse of Mateo, commenting that Mother and Father are "patient," "gentle," and take "good care" of him.

The CSW consulted with Detective Miller, assigned to investigate for suspected child abuse. Detective Miller stated "no crime is suspected" and explained he did "not suspect[] child abuse, due to the child having a history of . . . multiple birthmarks on his body and . . . other medical issues, like Stork Bites, sensitive skin, and being lactose intolerant."

The CSW also consulted with Dr. Kablanian, who said her "main concern is . . . Mateo's multiple bruises on the right side of his body and the parents not having a good explanation for the bruises." The doctor expressed concern and did not feel Mateo

5

was safe in his parents' custody. The doctor stated Mateo has red spots and yellow/green bruises on his body. The doctor confirmed the CT scan and skeletal survey results were negative and Mateo had no fractures. The doctors initially diagnosed Mateo with a nursemaid's elbow injury but a nurse manipulated Mateo's arm and put the elbow back in place. DCFS obtained Mateo's medical records and doctors' notes, as well as photos of Mateo's birthmarks, stork bites, Mongolian marks, and bruises.

Mother and Father have no criminal history and no prior DCFS history.

On October 6, 2024, a safety plan was implemented where MGM moved in with Mother and Father for the next week and became Mateo's "primary caregiver."

On October 8, 2024, DCFS sought a removal order. The juvenile court declined to remove Mateo, finding the "[f]acts as stated insufficient to support removal order."

B. *Petition and Initial Hearing*

On October 11, 2024, DCFS filed a section 300 petition on Mateo's behalf. It alleged:

- Counts a, b: On October 5, 2024, two-month-old Mateo was medically examined and "found to be suffering from a detrimental and endangering condition consisting of a right upper extremity injury and bruises to [his] right jaw line, right posterior upper shoulder, right and left mid-back, right lower back, and right buttocks." The parents' explanation of how Mateo sustained these injuries is "inconsistent" with his injuries; the injuries are "consistent with non-accidental trauma." "Such physical abuse was excessive" and caused Mateo "unreasonable pain and suffering." Such injuries would

6

not ordinarily occur except as the result of "deliberate, unreasonable, and neglectful acts" by the parents, which endangered his physical health and safety and placed him at risk of serious physical harm.

The petition expressly specified DCFS "will be relying on [s]ection 355.1(a) to assert that a rebuttable presumption exists finding that the minor is a person described by [section 300, subdivisions (a) and (b)]."

At the initial hearing on October 22, 2024, both parents denied the petition's allegations. Mother argued Mateo should be returned to the parents' custody or, alternatively, the parents be allowed to move in with MGM. Father joined Mother's argument. DCFS asked the court to order the parents "not be present in [MGM's] home if the court is inclined to release to [MGM]."

The juvenile court found: "I'm really not convinced—let me put it this way: this is an iffy situation right here. If this was a trial, [DCFS] would very likely lose. But this is a much lower standard; okay? . . . This is not the worst case in the world." "We're going to try to keep this family together. We're going to try and make sure that this child has a good childhood. And that's my main goal. Not to protect [DCFS's] people but to protect this child." The court continued, "[T]here's been two safety plans that have already been entered into and nothing else bad seems to have been happening since that safety plan." The court noted it will "try and get this family back together if and when I can."

The court found "a prima facie case exists" that Mateo is a person described by section 300; it ordered Mateo detained from parents and released to MGM. The court further ordered unmonitored visits for Mother and Father at least nine hours per

7

week, with MGM present at MGM's home; if MGM is not present, then monitored visits with a monitor approved by DCFS.

C.  *Developments During Dependency Proceedings*

The dependency investigator (DI) interviewed Mother on October 28, 2024.  Mother stated she is still on maternity leave and is "home all the time" with Mateo.  Mother stated she noticed the bump near Mateo's elbow after having returned from Target.  She "noticed the marks on [Mateo's] back and on his shoulder" when she showered him earlier in the day on October 4th; she was not alarmed because Mateo's skin was prone to "reddish marks."  She had not noticed the bruise on Mateo's jawline until they were at the hospital.  Mother said she "pulls [Mateo] up to a sitting position by having him grab on to her fingers, while he is on the changing table."  Mother stated, "If I did pick him up wrong, it was not intentional.  I'm not always super gentle with him because I know that he can take it. . . . If I did pull him too hard, it was not intentional."

The DI interviewed Father on October 30, 2024.  Father stated the marks on Mateo's hand and buttocks are Mongolian spots and birthmarks.  Father believed the mark on Mateo's face "could be [from] the way I feed him.  I would have his butt on my lap and . . . will have him [burp] like a c-cup and hold his back.  It could have been from that."  Father stated the marks on the back of Mateo's head are "birth marks called stork bites" and that the redness around Mateo's belly was caused by diaper rash.  Father stated he and Mother have never shaken Mateo and know not to.  Father informed the DI that he enrolled in a parenting program.

On October 29, 2024, the DI interviewed the pediatrician Dr. Teresita Salazar, who stated she examined Mateo on September 26th and observed no bruising.  The DI asked Dr.

8

Salazar if it is likely Mateo sustained the nursemaid's injury "from pulling [Mateo's] arms forward, when he has his arms down alongside his body while on 'tummy time?' " Dr. Salazar stated, "If you pull the arm with force, most probably you can. It would have to be with force." Dr. Salazar stated both Mother and Father seem like "responsible parents." She stated she will follow up with the parents for parenting education. Dr. Salazar's nurse practitioner stated that Mother previously informed her that Mateo "will get red marks from picking him up, because he has sensitive skin."

During the DI's telephonic interview with MGM on October 29, 2024, MGM stated that Mother and Father "both love their baby and they will do anything to help their baby grow." When asked what programs Mother or Father could benefit from, MGM stated "whatever training you get can help you. I'm pretty sure [they] can learn from anything."

On October 30, 2024, Dr. Kablanian sent the DI an e-mail, stating that a nursemaid's elbow injury is "commonly seen in toddlers/young children (between ages 1–5 or so). We see this type of injury after parents report swinging their child by the hand, or when they are holding a child's hand when either the parent has to suddenly jerk the hand to prevent the child from falling/running away or when a child attempts to forcefully yank their own hand away from the parent (i.e. throwing a tantrum). [¶] The tricky thing in Mateo's case, is that by the time we evaluated him in the hospital, his arm was already back to baseline. . . . [H]e immediately started using his arm normally again and the bump disappeared as soon as an individual in the ER performed some arm exercises on him. . . . Unfortunately, once this occurs, there is no way for us to confirm that Mateo did

9

100% have a nursemaid's elbow, as there would be no findings on X-ray." Dr. Kablanian continued: "Regarding [M]other's possible provided explanations . . . , if any of these maneuvers were done using more force than typical (i.e. involving forceful tug), it is possible they could have resulted in the dislocation."

The DI interviewed Dr. Kablanian on October 31, 2024. Dr. Kablanian expressed concern that "a child as young as Mateo should not have bruises on his back, and that brings a high concern for abuse." Dr. Kablanian stated that the marks on Mateo's back were bruises and not birthmarks or marks from Mateo having sensitive skin; she explained that the bruise was not blanchable, meaning, the "color did not change when pressing on the bruises."[2] Dr. Kablanian stated the family was unable to provide reasonable explanations for the bruises. She stated that the "bruising alone brings a very high concern for child abuse, and that the elbow injury adds even more concern" because "nursemaid elbow injuries are seen in children as young as 1 year old, after the child has learned to walk"; "it is rarely seen in young babies because they are not mobile and there is no reason to tank on a baby's arm." She confirmed that the follow-up skeletal survey returned clear. She also confirmed the bruises were gone when she saw Mateo at a follow-up examination on October 11, 2024.

---

[2] The "skin turns white or pale when pressure is applied, but then returns to is original color when the pressure is released."

10

D. *Adjudication*

Adjudication took place on November 8, 2024.

Mother, Father, and minor's counsel requested the juvenile court to dismiss the petition. As for count a, minor's counsel argued: "The evidence that [DCFS] has presented indicates that Mateo's arm injury was very likely accidental. . . . Mother and Father offered three possible explanations for how they could have accidentally caused Mateo's elbow injury." "Nor has [DCFS] produced any evidence that the various small bruises and marks on Mateo's jaw, shoulder, and back are the result of intentional physical abuse. Some of the marks are described as red marks . . . and I think those can be explained as the result of Mateo's exceptionally sensitive skin." Minor's counsel referred to Mother's messages to Mateo's doctor, prior to DCFS involvement, where Mother asked questions about how to treat Mateo's sensitive skin. "Other marks are described as being more blue or yellow-green in color consistent with bruising" but "[t]hese bruises were all small . . . . There are many non-abusive ways that a sensitive infant could end up with such a bruise. He could roll over on a hard toy or get accidentally jabbed by the metal buckle of a car seat harness."

And as for count b, minor's counsel argued, "[E]ven if the court is inclined to characterize Mateo's injury as the result of neglect by Mother and Father, there's little reason to be concerned that something like this would happen again in the future. The totality of the evidence in the reports indicates that Mother and Father are loving, attentive parents." Since Mateo's placement at MGM's home, "Mother has spent all day, every day caring for Mateo at [MGM's] home. She and Father have been cooperative with [DCFS] and have both already enrolled in

11

parenting classes.  I think that Mother and Father have learned a lesson in one of the roughest possible ways about the need to handle an infant with extraordinary gentleness.  And I don't believe that Mateo is at subsequent risk of suffering a similar accidental injury if he were to be returned to his parents' care today."

DCFS asked the court to sustain the petition and find the evidence supports application of the section 355.1 presumption. DCFS argued: "The medical evidence indicates very clearly that these injuries are not typical of a child that is two months old. Older, maybe.  But a child this age that is not mobile is not subject to these types of injuries."  Dr. Kablanian was "very clear that to have a nursemaid injury to a child of his age, the child had to have undergone a forceful pulling of his arm."  Dr. Kablanian was "very specific regarding the concerning marks on the child and is very clear that these marks are bruises.  They are not a result of any sensitive skin or any skin condition." DCFS argued, "It is clear that the acts were intentional."

The juvenile court disagreed with DCFS and found DCFS has not shown that Mateo remains at substantial risk of harm. The court made lengthy findings: "[T]he bruising pattern, as far as I can determine from the pictures, do not appear to be consistent with some kind of striking of the child that would cause bruising by a hand, by a belt, by something else that physically could impose and impart to the human body bruises. [¶] I'm not an expert on bruises, I will say that.  But I've seen a lot of bruises both in criminal . . . and in dependency cases.  If somebody has a bruising in a pattern of a figure of a hand or fingers or something of that nature, that's going to be something that is clear.  You can't miss it."  The court found "[t]hese bruises

12

are not of that nature. They're small, round-ish mostly but somewhat misshapen on others. They're not very strong bruises. They're more like red marks that I can tell. It does not appear that any of these marks, in my estimation, are consistent with intentional infliction of harm to the human flesh of this child. I don't find that it was intentionally done based on this evidence."

The juvenile court "agrees with minor's counsel . . . that this is not an a count. The question is whether or not it's unintentional, a neglectful act by Mother or Father . . . and whether or not that risk is of such a nature today that we need to take jurisdiction . . . because otherwise the child is going to be at risk of continued injury. The evidence doesn't support that. [¶] There's been no additional photos that I've seen that currently show any kind of additional injury, . . . or that the parents . . . are not taking good care of the child or . . . are not understanding that they need to be more careful and are taking classes to address that." The court continued: "Maybe these bruises were unintentionally inflicted by Mother that wasn't being as careful that she should have been if she knew that the child bruises easily, and she should have been more careful. But there's no evidence today that she's not being careful."

The court found there was "no evidence that this is a high-risk situation. . . . Mother's caring for the child virtually 12 hours a day in [MGM's] home. Father's there as often as he can considering his work schedule. There's nothing in the reports today that shows that the risk today is going to be the same or greater than anything that happened when this case first came in." The court concluded "the case has not been made by [DCFS] that [count] b is true."

As for section 355.1's presumption, the juvenile court stated "this presumption [allows courts] to determine whether or not this injury is of such a nature that there must have been abuse. . . . [¶] But a presumption is not a conclusion. The trier of fact still has to make up his or her mind that the act was done in such a way as to intentionally injure a child for [count a] to be true or unintentionally injure a child for [count b] to be true, and that there's evidence that this neglect by a parent or parents would go on again in the future."

The juvenile court dismissed the petition without prejudice. DCFS filed a notice of appeal.

## DISCUSSION

DCFS argues the juvenile court erred by *not* finding section 355.1 presumption applicable, and instead "supplanting its own unsupported opinion." DCFS contends "[n]o party offered any evidence to rebut the evidence that [Mateo's] injuries were indicative of abuse. As such, the juvenile court erred in dismissing the petition."

We disagree.

A. *Applicable Law*

Section 300, subdivision (a) authorizes a juvenile court to exercise dependency jurisdiction over a child if the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted *nonaccidentally* upon the child by the child's parent . . . . [A] court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child . . . , or a combination of these and other

14

actions by the parent . . . indicat[ing] the child is at risk of serious physical harm."  (§ 300, subd. (a), italics added.)

Section 300, subdivision (b)(1) authorizes a juvenile court to exercise jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . : [¶] (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child [or] [¶] (B) The willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left.  (§ 300, subd. (b)(1)(A), (B).)  "The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."  (*Id.*, subd. (b)(3).)

Section 355.1, subdivision (a) provides: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."  (§ 355.1, subd. (a).)

Once DCFS establishes a prima facie case under section 355.1, the burden of producing evidence " 'shifts to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home.' "  (*In re A.S.* (2011) 202 Cal.App.4th 237, 242–243, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re D.P.* (2014) 225 Cal.App.4th 898, 903; see § 355.1, subd. (c).)

15

If the parents do raise rebuttal evidence, DCFS shoulders the burden of proving the facts alleged in the petition. (*In re A.S.*, at p. 243.) " '[W]hen the party against whom such a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor [the presumption] initially worked to prove the fact in question.' " (*Estate of Trikha* (2013) 219 Cal.App.4th 791, 803.)

B.    *Standard of Review*

Ordinarily we review the juvenile court's jurisdictional findings and disposition orders for substantial evidence. (*In re Quentin H.* (2014) 230 Cal.App.4th 608, 613.) Under this standard, we review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. (*Ibid.*) In making our determination, we " ' "do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773; see *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) We uphold the juvenile court's findings unless they are " ' "so lacking in evidentiary support as to render them unreasonable." ' " (*Jamieson v. City Council of the City of Carpinteria* (2012) 204 Cal.App.4th 755, 763.)

Here, however, whether the juvenile court properly applied an evidentiary presumption and whether DCFS had met its duty at the jurisdiction hearing to show by a preponderance of the evidence that Mateo was a child described by one of the subdivisions of section 300 are legal questions subject to de novo

16

review.  (*In re Quentin H.*, *supra*, 230 Cal.App.4th at p. 613; see *Farr v. County of Nevada* (2010) 187 Cal.App.4th 669, 682 [question whether board properly followed statute requiring shifting burden of proof in accordance with rebuttable presumption affecting burden of proof is legal determination reviewed de novo]; see generally *Howe v. Seven Forty Two Co., Inc.* (2010) 189 Cal.App.4th 1155, 1163 [" '[t]he mere introduction of evidence sufficient to sustain a finding of the nonexistence of the presumed fact causes the presumption, as a matter of law, to disappear' "].)

"[W]here the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," the "question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.)  Thus, the question before us is whether the juvenile court was compelled, as a matter of law, to find the section 355.1 presumption applied.

C.    *Analysis*

We find DCFS has not met the high burden required for reversal.

DCFS shouldered the burden to prove by a preponderance of the evidence that Mateo was a child described by section 300, subdivisions (a) and (b)(1), as alleged in the petition.  DCFS

17

indicated its reliance on section 355.1's presumption, the application of which would have shifted the burden of producing evidence to Mateo's parents to rebut the presumption.  The record demonstrates the juvenile court did not rely on the presumption, which DCFS contends was error.  More specifically, DCFS contends "[n]o party offered any evidence to rebut the evidence that [Mateo's] injuries were indicative of abuse."  This is not true.

Dr. Kablanian's opinion was admitted into evidence as part of the DCFS reports submitted to the juvenile court.  The numerous interviews with Mother, Father, and MGM were also admitted into evidence as part of those same DCFS reports.  Through those interviews, Mother and Father provided reasonable explanations as to what may have caused the marks on Mateo, contrary to Dr. Kablanian's "main concern [of] . . . Mateo's multiple bruises . . . and *the parents not having a good explanation for the bruises*."  (Italics added.)

Regarding the nursemaid's injury, Mother indicated it could be "due to the way she holds the child, because she tends to hold him under his arm pits, with her two arms."  The DI asked Mateo's pediatrician Dr. Salazar if it is likely Mateo sustained the nursemaid's injury "from pulling [Mateo's] arms forward, when he has his arms down alongside his body while on 'tummy time?' "  Dr. Salazar stated, "If you pull the arm with force, most probably you can.  It would have to be with force."  Mother stated, "If I did pick him up wrong, it was not intentional.  I'm not always super gentle with him because I know that he can take it. . . . If I did pull him too hard, it was not intentional."  Father similarly told the CSW that Mother tends to lift Mateo up "with her two fingers on each side."

18

Regarding the mark on Mateo's jawline, Mother said "it is probably due to the way [F]ather burps him," using the "C-cup style, in which [F]ather makes a C shape with his hand, and then burps the child from the back." Father also said it might be from the way he burps Mateo in a C-cup position.

As for the redness on Mateo's stomach/buttocks, Mother said "it is probably from his diaper" and that she has tried multiple brands of diapers and was "struggling to find the right diaper brand, because they all give [him] a diaper rash." Father said the marks on Mateo's buttocks are Mongolian spots and birthmarks, and that the redness around Mateo's belly was caused by diaper rash. He explained that he and Mother tried at least three different diaper brands but haven't yet found one that works with Mateo's sensitive skin.

Additionally, there were doctors' notes, the CSW's noted observations, and the parents' interviews regarding Mateo's sensitive skin and many birthmarks, Stork's kisses, Mongolian marks, and "red blemishes all around his body." Mother confirmed Mateo has "at least eight birthmarks on his body." The CSW noted how sensitive Mateo's skin was and personally observed the "Stork kisses" he was born with, including the "redness on [Mateo's] skin, on his forehead, the top of his head, on his neck, on his nose, and on both eye lids." Furthermore, Dr. Kablanian confirmed Mateo's CT scan and skeletal survey results were negative for signs of abuse. Dr. Kablanian also confirmed Mateo had no bruises at a follow-up examination on October 11, 2024. Mateo's pediatrician Dr. Salazar told the DI that the parents seem "like responsible parents" and that she had not observed any bruising during her examination of Mateo on September 26, 2024. Detective Miller's investigation also

19

concluded "no crime is suspected" and that he did "not suspect[] child abuse, due to the child having a history of . . . multiple birthmarks on his body and . . . other medical issues, like Stork Bites, sensitive skin, and being lactose intolerant." MGM stated she had no concerns of neglect or physical abuse by Mateo's parents.

The record shows although the juvenile court considered section 355.1 in its analysis, it weighed the competing evidence cited above and determined that DCFS had not met its factual burden to apply the presumption. The juvenile court found at the November 8, 2024 adjudication hearing that the marks on Mateo were not "consistent with intentional infliction of harm"—"I don't find that it was intentionally done *based on this evidence*." (Italics added.) The juvenile court further found "[t]*he evidence* doesn't support" that the "risk is of such a nature today that we need to take jurisdiction"; "*no evidence* that this is a high-risk situation." (Italics added.)

While the presumption under section 355.1 "disappears upon the introduction of evidence which would support a finding of its nonexistence (Evid. Code, § 604), the trier of fact, here the juvenile court, must still weigh the inferences arising from the [professional's] testimony which gave rise to the presumption against the contrary evidence . . . and resolve the conflict." (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547, superseded by statute on another ground in *In re David H.* (2008) 165 Cal.App.4th 1626, 1642, fn. 14; see *In re D.P.*, *supra*, 225 Cal.App.4th at pp. 904–905.) That is exactly what the juvenile court did at the adjudication hearing. "Where there is more than one inference which can reasonably be deduced from the facts, the appellate

court is without power to substitute its deductions for those of the trier of fact." (*In re Katrina C.*, at p. 547; *In re D.P.*, at p. 905.)

We find the juvenile court was not compelled as a matter of law to apply section 355.1's presumption—specifically because DCFS's evidence was not " 'uncontradicted' " and " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

The juvenile court did not err in finding section 355.1's presumption did not apply. Nor did it err in dismissing the section 300 petition.

## DISPOSITION

The order of dismissal is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:


WILEY, J.


VIRAMONTES, J.

21